STEVENS, Respondent, vs. MONTFORT STATE BANK, Defendant, and PARKER, Commissioner of Banking, Appellant.

*April 9—May 6, 1924.*

*Banks: Cashier as agent of depositor: Evidence: Sufficiency: Declarations of agent: Estoppel to deny liability for cashier's acts: Interest on depositor's balances: Validity of agreement to pay six per cent.: Pass-books: Account stated: Trial: Amendment of pleading: Discretion of court: Instructions relating to number of jurors required to agree: Non-prejudicial error.*

1. An instruction that, if ten or more jurors are convinced that the answer to a question submitted should be "Yes," the answer will be "Yes," but if ten or more are not so convinced the answer will be "No," is clearly erroneous, as there is no room whatever for the jury to disagree on a verdict. p. 626.

2. Declarations of an agent as to his agency, made to third persons, are not competent to establish the agency. p. 629.

3. The evidence, detailed in the opinion, hardly presented a jury question as to whether a defaulting cashier of a bank was the agent of the plaintiff in withdrawing her funds, but if it did no jury would be justified in finding such an agency, and therefore error in the instructions relating to the question submitted was not prejudicial. p. 629.

4. Where, but for the representation of a bank cashier that the directors had agreed to pay interest on daily balances of a checking account, the depositor would have withdrawn her money and otherwise invested it, and the directors had permitted the cashier to manage the bank, both the bank and its receiver are estopped to claim immunity from liability on the cashier's agreement. p. 631.

5. The average amount in plaintiff's checking account being $20,000 and representing a more valuable asset than an ordinary commercial account, and the inception of an agreement to pay six per cent. interest being at a time when the country was about to enter the World War, and the deposit having been continued during a time when there were great demands for money, it was not contrary to public policy for the bank to agree to pay six per cent. interest thereon.  p. 635.

6. The pass-book of the depositor having been balanced annually for seven years and the parties having acquiesced in such account, after such balancing, for a long period of time, the statement of account as represented by the pass-book was properly held to be an account stated.  p. 636.

7. The rule that a settlement between individuals, or where an account is stated between them, will not be set aside except on the clearest proof of fraud or mistake, is particularly applicable as between a depositor and a bank.  p. 635.

8. An application to amend an answer to allege fraud and mistake, made after the defendant had proceeded to establish his defense, and the proposed amendment not setting forth any specific facts but being couched in general language, was properly denied, as the proposed amendment would have worked great hardship on the defendant and no plausible excuse having been offered for failure to plead fraud or mistake timely, and no diligence shown for failure to include proper allegations in the answer.  p. 636.

APPEAL from a judgment of the circuit court for Grant county: S. E. SMALLEY, Circuit Judge.  *Affirmed*.

This is an appeal by the defendant commissioner of banking from a judgment in favor of the plaintiff in the sum of $44,048.20 damages and $83.05 costs.

On June 8, 1922, the *Montfort State Bank,* being insolvent, discontinued doing business, and on June 10th the banking examiner of the state of Wisconsin took possession of all of the assets of the bank for the purposes of liquidation.  One C. K. Stephens, at the time the bank closed its doors, was its cashier and managing officer, and had been so connected with said bank for many years.  The plaintiff is a widow about ninety years of age, and, by reason of injuries sustained some seven years prior to the trial, became physically incapacitated from personally attending to her

banking business, and during the period of such incapacity one Jennie Frankland, a foster-daughter about forty years of age, attended to such business. During the years 1916 and 1917 and prior thereto, up to the time of the closing of the bank, plaintiff had a large amount of money on deposit in said bank to the credit of her checking account, and was also the owner and holder of a number of certificates of deposit. Immediately after the bank went into liquidation plaintiff filed a claim with the banking commissioner in a large sum of money, which included the amount due her on her checking account, with interest computed thereon on daily balances at the rate of six per cent. per annum, and also an amount due on certificates of deposit, with interest thereon at the rate of five per cent. per annum. The commissioner allowed the amount claimed on the checking account at the sum of $2,352.05, which was the amount that appeared to be owing to the claimant upon her checking account according to the books of the bank. Thereafter the plaintiff brought this action for the recovery of the sum of $35,385.23, claimed to be due the plaintiff on her checking account, plus $2,002.14 interest thereon, and for the further sum of $7,220.90, claimed to be due on certificates of deposit, with interest thereon.

In the year of 1916 or 1917 Stephens, the cashier, made the statement to Miss Frankland that the directors of the bank had met and decided to allow the plaintiff six per cent. interest on her daily balances to her credit in the checking account if she permitted a substantial amount of her moneys to remain on deposit in such account; and it appears beyond dispute that this offer was accepted, and that from that time on until the time when the bank ceased to do business plaintiff had at all times on deposit in said bank to the credit of her checking account a large amount of money, averaging about $20,000. Once a year from the time said agreement was entered into, the plaintiff left her pass-book with the bank to be balanced, and upon such occasions the amount

due the plaintiff for interest was computed and credited on such book and the balance was stated and the canceled vouchers returned. This pass-book was last balanced in April, 1921, and the book had been left with the bank in May, 1922, to be balanced, but had not been returned to the plaintiff when the bank closed. It appears from the evidence that between April, 1921, and June, 1922, numerous deposits had been made by the plaintiff to the credit of her checking account, and that she had also drawn a number of checks on such account.

Upon invitation of the banking examiner Miss Frankland called at the bank and identified a number of securities contained in an envelope upon which was written the name of *Barbara Stevens,* which she took with her as the property of the plaintiff. In a certain wallet found in the private box of the cashier were a large number of securities consisting principally of notes signed by one Cookson and one Wayne, and by them jointly, with the name of the payee left in blank or in which the initials of the plaintiff, "B. S.," had been inserted, which ostensibly represented moneys withdrawn from the bank and charged on the bank's books to the account of the plaintiff. It is also shown by the evidence that the Cookson and Wayne notes charged to the plaintiff, and other notes similarly signed and payable to others, were absolutely worthless; and that the amounts so drawn from the bank were used for the benefit of the cashier or of his confederates.

The jury returned a special verdict, wherein it found (1) that C. K. Stephens was not the agent of the plaintiff, *Barbara Stevens,* from April, 1921, to June 8, 1922, with authority to withdraw money from her checking account in the bank without a written check or order from the plaintiff; (2) that in the latter part of the year 1916 or the first part of the year 1917 Stephens informed Jennie Frankland that if the plaintiff would leave the money she then had on checking account in the bank the directors of the bank had agreed

to pay her six per cent. interest per annum upon her daily balances, and would pay her like interest on any money she might thereafter deposit in said bank on checking account. Judgment was thereupon entered as aforesaid in plaintiff's favor, and from such judgment the defendant banking commissioner has prosecuted this appeal. Further facts will be stated in the opinion.

For the appellant there was a brief by *R. T. Jackson* and *Fiedler, Fiedler, Jackson & Boardman,* all of Mineral Point, and oral argument by *E. C. Fiedler.*

For the respondent there was a brief by *R. M. Orchard* of Lancaster and *Kopp & Brunckhorst* of Platteville, and oral argument by *Mr. A. W. Kopp* and *Mr. Orchard.*

DOERFLER, J. Defendant's counsel strenuously argue that there is ample evidence in this case from which it can be inferred that Stephens, the defaulting cashier, when he withdrew moneys from the bank between April, 1921, and June 8, 1922, did so as the agent of the plaintiff; that he was duly authorized so to do; and that therefore the first question submitted to the jury presented a proper jury issue; that the court in instructing the jury upon such issue committed prejudicial error, and that therefore the judgment should be reversed and the defendant awarded a new trial.

In explaining to the jury the recent change wrought by statute with reference to jury trials in civil cases, the court instructed as follows: "The result of this law is that if any ten of your number agree, you may answer any question submitted to you and return a verdict accordingly." This instruction, while not excepted to in the instant case, has been held error in the case of *Dick v. Heisler,* decided May 10, 1924 (184 Wis. ——, 198 N. W. 734).

Referring to the first question of the special verdict the court instructed the jury as follows:

"The burden of proof as to this question is upon the defendant to convince you to a reasonable certainty by a

preponderance of the evidence that your answer thereto should be 'Yes;' and if ten or more of your number are so convinced you will answer this question 'Yes;' but if ten or more of your number are not so convinced you will answer this question 'No.' "

It is this instruction pertaining to the first question which defendant's counsel contend is prejudicial error. That such instruction is erroneous becomes manifest from a casual reading of the same. The jury is instructed that if ten or more are convinced that the plaintiff has met the burden of proof under such instruction they should answer the question "Yes," but if ten or more are not so convinced they should answer the question "No." This instruction, logically interpreted, can only convey to the jury the idea that if ten or more are not convinced to answer the question "Yes," then they must answer the question "No." This leaves no room whatever for the jury to disagree on a verdict. This was clearly error. But it is contended by counsel for the plaintiff that the record does not disclose an issue upon the subject of agency, or, assuming that an issue is raised by the evidence, the testimony is so overwhelming in plaintiff's favor that no jury, properly instructed, would or could have answered such question in the negative, and that therefore the verdict of the jury upon this question should not be disturbed.

Among other things it is claimed by defendant's counsel that the record shows that Stephens and the plaintiff were intimate friends; that her certificates of deposit were kept in his private safety-deposit box; that on numerous occasions during business hours he had visited the plaintiff at her home, ostensibly for the purpose of discussing business matters; that he was authorized to and did collect the interest maturing on loans; that he also negotiated a number of loans for the plaintiff; that debit slips, notes, and other securities payable to her were found in his private box in an envelope marked "B. S.;" that plaintiff had a private safety-

deposit box in the bank, and that the key to such box, during a large portion of the time, was left with Stephens in his office; and that a number of loans had been made through Stephens for the plaintiff where the borrowers had no acquaintance with her. Such evidence, it must be conceded, establishes an agency, but it does not establish a general agency. It is limited to certain specific acts, such as the collection of interest, the making of investments in certain securities, for which her express consent had been obtained, and, as the evidence shows in one instance, to attend to the foreclosure of a mortgage. The record is absolutely barren of any evidence showing authority granted to Stephens to withdraw her funds, either by the issuance of debit slips or by crediting her with notes for which moneys to her credit had been withdrawn. In every instance where she actually withdrew money from her account such withdrawal was evidenced by a canceled check, with but one exception, when a bill for income tax was paid by a draft purchased from the bank by Miss Frankland. No one can read the record in this case without being impressed with certain prominent, outstanding, and persuasive facts, all tending to prove beyond reasonable controversy that Stephens was not authorized to draw upon plaintiff's account as he saw fit in making investments or in using the money for his own personal benefit.

In the brief of defendant's counsel this statement appears: "Obviously C. K. Stephens, from time to time, withdrew sums of money from the plaintiff's checking account wrongfully." If he had authority to withdraw such money by reason of an established agency, the mere withdrawal itself would not be wrongful. The moneys withdrawn and represented by the Cookson and Wayne notes were used for his own private benefit or for the benefit of his worthless and irresponsible confederates. Many of the unauthorized withdrawals were made within a short period preceding the time when he absconded as a defaulter and as a wrong-

doer. If Stephens had the authority to withdraw these funds from time to time, why were not these withdrawals charged against the plaintiff in her pass-book? The very fact that the pass-book evidenced a large amount due the plaintiff on her checking account, while in the books of the bank her credit had been practically exhausted, is convincing that Stephens fully realized that he had no authority from the plaintiff to make withdrawals from her account unless expressly authorized by her by a check or an order. Besides, it appears affirmatively from the testimony of both the plaintiff and Miss Frankland that Stephens had no authority to withdraw any of her money constituting her credit at the bank unless so authorized by a check or order, and this evidence is not contradicted.

But it is claimed by defendant's counsel that the court erroneously rejected evidence offered by the defendant which tended to establish agency. It is claimed that one Sabinson purchased through Stephens a note and mortgage payable to the plaintiff which was indorsed as follows: "I hereby transfer my interest in and to this note. *Barbara Stevens,* by C. K. Stephens, Agent." Defendant offered to prove in connection with this transaction that Stephens made the statement that he was the general agent of the plaintiff and had full power and authority to transact any and all business for her. The note, with such indorsement, was offered in evidence, and the defendant offered to prove that C. K. Stephens went to the home of the plaintiff and obtained her mark upon the indorsement. This evidence was rejected, and defendant assigns such rejection as error. The plaintiff was a woman ninety years of age. For many years prior to the failure of the bank she had been incapacitated from personally transacting her banking business. While the record shows that she did not expressly deny having affixed her mark to this indorsement, she testified that she had no definite recollection upon the subject. Even though this indorsement on its face bore evidence that Stephens was her

agent, in that it stated *"Barbara Stevens,* by C. K. Stephens, Agent," the very fact (if it be a fact) that she was requested to and did affix her mark to the indorsement would show that her express approval thereto was first required. It would amount to nothing further, in any event, than an approval of this indorsement in this particular instance.

That the plaintiff had implicit confidence in Stephens cannot be doubted. She had transacted business with him for many years. He was a friend and a neighbor. She intrusted her funds to a bank of which he was the cashier and the managing officer. The affixing of her mark, under all the facts and circumstances of the case, assuming that it was so affixed, would not be convincing that she recognized Stephens as her general agent. There was no evidence in the case from which such agency could reasonably be inferred; on the contrary, such agency was expressly denied.

Declarations of an agent of his agency, to third persons, are not competent to establish agency. *Somers v. Germania Nat. Bank,* 152 Wis. 210, 216, 138 N. W. 713; *Davis v. Henderson,* 20 Wis. 520; *McCune v. Badger,* 126 Wis. 186, 191, 105 N. W. 667. In this case it is not attempted to prove the agency by the testimony of the agent himself, which would be competent under the decisions in *O'Conner v. Hartford F. Ins. Co.* 31 Wis. 160; *Roberts v. Northwestern Nat. Ins. Co.* 90 Wis. 210, 62 N. W. 1048; *Smith v. State,* 149 Wis. 63, 134 N. W. 1123, but such agency was attempted to be shown by the declarations of the agent to third persons. Had the agency of Stephens been first shown by evidence expressly establishing such agency, or had it been shown by facts and circumstances from which agency would be necessarily presumed, a different situation would be presented.

Under the evidence as so detailed it can hardly be said that the question of whether Stephens was the agent of the plaintiff with respect to the withdrawal of her funds from the bank presented an ultimate issue to be determined by the

jury; but whether or not we conclude that an issue was presented in the case, we cannot escape the inevitable conclusion that no jury would be justified in coming to a different conclusion than that arrived at in the instant case. The error, therefore, in the instructions was not prejudicial.

Defendant's counsel further assign as error the allowance of interest on daily balances. Miss Frankland testified that six or seven years prior to the failure of the bank plaintiff was induced to permit large balances to remain to her credit in her checking account by the representation of Stephens that the directors had agreed to pay interest upon such daily balances at the rate of six per cent. per annum. Prior to that time the plaintiff from time to time withdrew from her checking account large sums of money in order to invest the same in interest-bearing securities, and it also appears that from the income of such investments she defrayed her living expenses. She also testified that had it not been for such representations she would not have permitted these large balances to plaintiff's credit in the bank on the checking account to remain, but would have continued to make investments in interest-bearing securities.

Defendant's counsel also claim that the agreement to pay interest on open balances subject to check is unusual with banks, and particularly with small banks in the country such as the bank in question; that the cashier, as such, had only the authority to represent the bank with reference to transactions which were within the usual and ordinary scope or authority of a cashier; that if interest could legally be paid under any circumstances by a bank on such daily balances, the bank could only be bound pursuant to action first taken by the board of directors. The minutes of the bank directors were offered, and it appears therefrom that the directors had taken no action upon this subject. The president of the bank was not a trained banker, but was an ordinary merchant with no practical experience in banking. The testimony shows that he acted as such president merely

nominally, without taking any active part in the conduct of the bank, and that the directors were merely directors in name, who failed to function in their official capacity as is required of directors under the law. The bank was a one-man bank, and Stephens was the man. He and his wife were the owners of and controlled 130 of the 200 shares of the capital stock of the institution. A situation like the one here presented is not unusual in small communities where small banks are conducted. The court held that, without authority from the board of directors, the cashier of the bank would have no authority to enter into an agreement with a depositor which would bind the bank to pay interest on daily balances; but in view of the representation made by the cashier, and of the acquiescence on the part of the directors to permit substantially the entire business of the bank to be controlled and conducted by the cashier, and in view of the uncontradicted facts showing that the money had remained on deposit under this agreement during a long period of time, and that interest had from time to time actually been credited to the plaintiff upon her pass-book, and that the plaintiff relied upon such representations to her detriment, the bank is estopped from taking any advantage of its otherwise legal rights.

In the instant case Stephens was not only the cashier of the bank, and as such, under the law, its chief executive and administrative officer, but he was also, with the tacit consent of the board of directors, the managing officer, and to all intents and purposes the bank itself. The facts in this case, as far as the legal aspect involved is concerned, are not greatly dissimilar from those presented in *Davenport v. Stone,* 104 Mich. 521, 62 N. W. 722, where it is said:

"The directors intrusted the entire management of the bank to the cashier, Mr. Bradley. Therefore, neither the bank nor its receiver can now be heard to deny the authority of the cashier to do any of those acts which it or its directors might lawfully authorize the cashier to do. The rule is

stated by Mr. Morse as follows: 'If the directors have for many years allowed the cashier to do, without interference, all the business of the bank, they are held thereby to have conferred upon him authority to do anything and everything on the corporate behalf which the charter or law does not absolutely prohibit and forbid a cashier to do. . . .' 1 Morse, Banks, § 165." See, also, *Arnold v. Nat. Bank of Waupaca,* 126 Wis. 362, 367, 105 N. W. 828; 3 Fletcher, Ency. Corp. p. 3316, § 2138.

The law as stated in the *Davenport Case* above referred to appeals to us as sound doctrine.

It is not contemplated by the statutes authorizing and regulating state banks that a bank shall be conducted and operated solely by one person. In order to avoid such a situation a governing body must exist in the form of a board of directors. When the legislature saw fit to require a board of directors it had in mind a governing, functioning body. When it prescribed the duties of directors it did not intend that such duties be nominal merely. The provision for the office of a director and the functions prescribed were deemed necessary for the successful operation of a bank, which is a *quasi*-public institution, in which are interested not only the stockholders and the depositors but also the public residing in the community. Private banks, owned and operated by individuals, had in the past for a long time been authorized in this and other states. But the legislature of this state and the legislatures of other states have wisely seen fit to confine the conduct of banks to banking corporations, so that we have now clearly a legislative intent and policy, fully expressed, condemning these so-called one-man banks.

From what has been heretofore said, we hold as a matter of law that the bank and its present representative as receiver, the banking commissioner, are estopped from claiming immunity from liability to pay interest on the daily balances under the agreement entered into.

Defendant's counsel further contend that "an agreement by a bank of the size and character of the *Montfort State*

*Bank* to pay interest at the rate of six per cent. upon daily balances should be held void as being against public policy." It is argued that the usual rate of interest received by banks on loans made to customers is six per cent.; that the successful and profitable operation of a bank depends largely upon the interest received by it from loans made to its customers; that if such practice to pay six per cent. interest on daily balances were general, a bank would necessarily be confronted with ultimate failure, as it would eliminate the profits on loans which are necessary to pay the overhead expenses of the bank, the usual and ordinary losses on loans, and dividends to the stockholders. What is here said by defendant's counsel is to a large extent true. If such were the general practice of a bank under ordinary circumstances and in normal times, the results above referred to would be likely to follow. A general rate of six per cent. on daily balances is an unusually high and ordinarily unwarranted rate of interest for a bank to pay on such deposits. It appears in the instant case that the rate of interest paid on certificates of deposit was five per cent. It is within the knowledge of most people who patronize banks that country banks pay a higher rate of interest on savings deposits or on certificates of deposit than large city banks. The writer has never heard of an agreement to pay six per cent. interest on the daily balances of a depositor held by the bank subject to check; but it is a fact quite generally known that banks in this state have established the custom of paying interest on daily balances to certain depositors. The ordinary commercial account would not warrant the payment of as high a rate of interest on daily balances as would the account of an individual not engaged in active business. This is so because a commercial account fluctuates from day to day and depends for its size largely upon the actual demands of the business of the depositor. The deposit may represent a large amount one day, and the total deposit may be practically withdrawn the next, etc. The experience of bank-

ers, however, has shown that, taking into consideration all of the deposits in a bank subject to check, a large substantial amount of such deposits may be relied upon as being constantly in the bank as an average which can be used in making loans to borrowers. The plaintiff in this case had done business with this bank for a great number of years. Her deposit in her checking account represented a valuable asset, in the form of good will, to the bank. The account in itself was unusually and extraordinarily large for a country bank. It appears from the record that the average balances of the plaintiff amounted to about $20,000. This amount the bank could reasonably depend upon in making loans. The account, therefore, was a far more valuable account than that of the ordinary commercial account. The period of time when the plaintiff was credited with six per cent. interest on daily balances was an abnormal time in financial circles. When the agreement was first entered into, the country was either on the verge of entering or was actually engaged in the World War. The resources of the nation were highly taxed and utilized in industrial and other operations designed for the successful prosecution of the war. Immediately after the war, housing conditions having become scarce, money was needed for building purposes; farming operations were highly profitable and a great demand sprung up for farms, and the value of farms was considerably enhanced. It was necessary for industrial and commercial businesses to be readjusted from a war to a peace basis. Prices of commodities soared skyward, and the purchasing power of the dollar was correspondingly decreased. Under such circumstances it can hardly be said that it was contrary to public policy for this bank, or any bank, to greatly increase its interest rates on daily balances so as to meet the requirements of legitimate borrowers. The custom is also quite universal in this state for banks to pay interest on daily balances on funds deposited by the state, the county, the city, or other municipalities, as well as on accounts of

larger depositors. In view of the peculiar situation presented, we are satisfied that the agreement to pay interest at the rate of six per cent. per annum on daily balances constituted a valid agreement.

Defendant's counsel also contend that the court erred in holding that the balanced pass-book constituted an account stated. In 1 Morse, Banks (5th ed.) § 291, it is said that:

"The entries in the bank book, made by the proper officer, bind the bank as admissions. Especially the balancing of the book is conclusive upon the bank, in the same manner as an account stated. In *Greenhalgh Co. v. Farmers' Nat. Bank*, 226 Pa. St. 184, 75 Atl. 260, it was held that a balance struck in a pass-book is in effect an account stated which may be impeached only for fraud or mistake." See, also, *Ripley v. Sage L. & I. Co.* 138 Wis. 304, 119 N. W. 108; *Ott v. Cream City S. Co.* 166 Wis. 228, 233, 164 N. W. 1005.

In *Klauber v. Wright,* 52 Wis. 303, 8 N. W. 893, the following appears in the first head-note:

"A settlement of their accounts deliberately made by two persons, without any intention to defraud a creditor of one of them, will not be set aside in favor of such creditor without at least the clearest and most positive proof of fraud or mistake as between the parties to such settlement." See, also, *Case v. Fish,* 58 Wis. 56, 108, 15 N. W. 808.

While it is the rule that a settlement made between individuals, or where an account is stated between them, will not be set aside excepting upon the clearest proof of fraud or mistake, this is particularly so as between a depositor and a bank. The business of the bank is confined to financial transactions. The conduct of its business is regulated by and is under the supervision of the state, through its banking department. The form of bookkeeping and accounting is also largely prescribed by the banking department. The condition of the bank is periodically investigated by an officer of the banking department, and the law requires periodical reports to be published as to the condition of the bank.

In the keeping of its books and accounts a bank relies upon expert, trained bookkeepers and accountants; in fact, skilled accountants are an absolute essential to the successful conduct of a bank. Therefore, we repeat, that while under the general rule applicable to all accounts stated, such statement cannot be set aside except upon clear showing of fraud or mistake, such rule is especially (and rightfully so) applicable to an account stated by a bank. Therefore, in the instant case, where the pass-book of the plaintiff was balanced annually during a period of seven years, and where the parties acquiesced in such account after each balancing for a long period of time, the statement of account as represented by the pass-book properly was held by the trial court to be an account stated.

It is further contended by defendant's counsel that the court erred in refusing to permit the defendant to amend his answer alleging fraud and mistake. Such request for an amendment was not made until some time after the defendant had proceeded to establish his defense. The amendment offered did not set forth any specific facts showing either fraud or mistake, but was couched in general language. It appears from the evidence that most of the canceled vouchers returned by the bank to the plaintiff had been destroyed or lost. No plausible excuse was offered for failure to plead fraud or mistake timely, and no diligence was shown for failure to timely include proper allegations in the answer. Under such circumstances the allowance of an amendment would have worked a great hardship upon the plaintiff. To permit an amendment at this stage of the trial was largely discretionary with the court, and we are satisfied that the court not only did not abuse its discretion in the premises but that it exercised its discretion wisely.

This disposes of the principal assignments of error of defendant's counsel.

We are convinced that the evidence in this case requires an affirmance of the judgment, and that by affirming such

judgment substantial justice will be done. Through the criminal conduct of Stephens, the plaintiff, whose fortune was largely invested in the bank, has been reduced from a condition of independence to one of dependence. At the time of the trial a dividend of but ten per cent. had been paid to the creditors of the bank, and but little more was hoped for in the form of future dividends. The result of the liquidation will realize to the plaintiff not much in excess of $5,000. While plaintiff was not the only creditor, and while others have been similarly unfortunate in having their trust in the bank and in the cashier abused, the misfortune is highly aggravated in plaintiff's case by reason of her age and incapacity. She, like other creditors, has been the victim of the defaulting and absconding cashier. The evidence clearly establishes that the amounts charged to the plaintiff and which were embezzled by Stephens and used directly or indirectly for his own individual purposes, were the moneys of the bank, and that such moneys were not withdrawn under authority of an agency of the plaintiff. The difference between the amount due the plaintiff as shown by her pass-book and the amount due her as admitted by the banking commissioner represents a defalcation on the part of the cashier, who juggled the books of the bank in order to pass the scrutiny of the bank examiner, and he held in readiness these worthless securities so as to make an apparent showing of solvency to the banking commissioner. On the other hand, he caused to be entered upon the pass-book of the plaintiff the various amounts actually received by the bank from her, with the accrued interest, and charged against such account only the amounts which were lawfully withdrawn by check or order. He had no authority to withdraw her funds, either by the issuance of a debit slip or by substituting, in place of withdrawals, worthless securities negotiated without her knowledge and consent. The judgment of the lower court must therefore be affirmed.

*By the Court.*—Judgment affirmed.