Hawkins Realty Company, Respondent, vs. Hawkins State Bank, Appellant.

*April 10—October 13, 1931.*

410

For the appellant there were briefs by *Falge & Stine* of Ladysmith, attorneys, and *Duffy, Duffy & Hanson* of Fond du Lac of counsel, and oral argument by *F. Ryan Duffy.*

For the respondent there were briefs by *Carow & Goodsitt* of Ladysmith, and oral argument by *J..W. Carow.*

The following opinion was filed May 12, 1931:

NELSON, J. Defendant contends: (1) That the secret agreement entered into between Ellingson, the president of the bank, and Vig, its cashier, was void—

(a) Because it violated an existing by-law of which Ellingson had knowledge or must be presumed to have had knowledge;

(b) Because it was wholly *ultra vires* as to Vig, the cashier;

(c) Because the contract was never ratified by the bank; and

(d) Because it is against sound public policy.

(2) That, in any event, all rights, if any, under the contract were barred by the statute of limitations.

The plaintiff, on the other hand, contends that the only question involved on this appeal is whether the action was commenced within the time limited by law.

The contract entered into between Ellingson and Vig clearly constitutes an agreement to repurchase from Ellingson sixteen different mortgages on the respective dates stated in the contract, the first date being October 11, 1920, and the last date being March 11, 1921. The contract can admit of no other reasonable construction. Such was the construction placed upon it by the Ellingson heirs when the contract came to light and was acted upon by them, and such is the construction placed upon it by the allegations of the complaint. When the Ellingsons discovered the contract they demanded that the bank repurchase the mortgages which at that time were unpaid.

(1) (a) Did the cashier, in view of the then existing by-law, have authority to enter into a contract to purchase or re-

purchase mortgages aggregating the sum of $30,000, which would bind the bank? It is very clear that this by-law, which is set forth in full in the statement of facts, gave no such authority to the cashier. The by-law specifically prohibited the cashier from purchasing "any bills, notes or evidences of debt amounting to more than $500 without the same shall have been approved by the board of directors or by a committee appointed by the board of directors for that purpose, known as the discount committee." Such by-law was both reasonable and valid. That Ellingson, as a stockholder, director, and president of the bank, was bound thereby seems too clear for argument. "A *valid* by-law binds each member as though a part of the charter, even though he was not a member when the by-law was passed." 1 Morse, Banks and Banking (6th ed.) p. 135, § 43. No question can exist in this case as to Ellingson's actual knowledge of the existence of the by-law since he was one of the founders of the bank and was continuously connected with it from its organization down to the time of the making of the contract. Since the by-law prohibited the cashier from purchasing "any notes or evidences of debt amounting to more than $500 without the approval of the directors," it is very evident that he could not bind the bank by an agreement to repurchase mortgages amounting in the aggregate to $30,000, each of which, with one exception (which was paid before the contract was executed), exceeded $500 in amount. So we conclude, on this branch of the case, that since the contract was entered into in violation of a valid by-law, it was at least voidable by the bank, and, in the absence of ratification by the board of directors, never became binding upon the bank.

(b) Was the secret agreement *ultra vires* as to the cashier and therefore not binding upon the bank? Even if there were no by-law involved in this action, we should still be forced to conclude that Vig, as cashier, had no authority to enter into such an agreement without being authorized so to do by the directors. While Vig had authority to pay or

redeem certificates of deposit, and may have had authority to pay or redeem a certificate of deposit by delivering to a holder thereof a mortgage belonging to the bank in lieu of cash, it is our opinion that he had no authority to enter into a contract to repurchase.

In view of the manner in which certain small banks have been managed, it is not unlikely that many people may have gained the erroneous impression that the authority of a cashier is unlimited. The carelessness and negligence of directors of some banks may be in part responsible for such impression. However careless and negligent directors of a bank may be in the performance of their duties, such carelessness and inattention to duty do not have the effect of changing the established law as to the authority which may properly be exercised by cashiers and boards of directors respectively. Directors may, at times, be so careless and negligent in the performance of their duties as to give rise to personal liability or, in exceptional cases, to create an estoppel to question the authority exercised by a cashier under certain circumstances. *Stevens v. Montfort State Bank,* 183 Wis. 621, 198 N. W. 600.

The nature of the cashier's office and duties, and that of the directors, is aptly stated in 1 Morse on Banks and Banking (6th ed.) p. 407:

"The keynote to the whole subject lies in this: that the office of the cashier is *strictly executive.* He is the business officer of the bank, but in the sense of one who *transacts* the business, not of one who regulates and controls it. The grand difficulty which has been experienced in defining his exact functions has always lain in the necessity of giving him sufficient practical power to enable him to conduct the daily routine of business without trespassing upon the domain of discretionary authority which pertains exclusively, and for the most part inalienably, to the directors. *Acts which demand only confidence in the integrity of the official, and familiarity with the forms and customs of business, acts strictly of performance, which do not rise to the importance of the semi-judicial character,* are those which he is properly

delegated to do. But the responsible conduct and management of the affairs of the institution, upon the soundness and wisdom of which its prosperity and success depend, which call for the exercise of a high degree of care, knowledge, and experience, and a semi-judicial discretion, which demand general business qualifications of a high order, are not, and never have been held to be, appurtenant to the office of cashier. He is properly the executive agent of the directors. It is his duty to carry out what they devise. They are responsible for the soundness of the action resolved upon; he is responsible for the honesty, accuracy, regularity, and skill with which that action is carried out. They are the mind and he is the hands of the corporation. They may decide to make a certain loan or discount, to sell or mortgage corporate property. He will pay over the money, take the borrower's promissory note, and see that it is in proper form; he may, by direction of the board, affix the corporate signature and seal, and make delivery, on behalf of the corporation, of all instruments necessary to complete the conveyance or the mortgage."

The power of a cashier to bind his bank is stated by Morse on Banks and Banking (6th ed.) vol. 1, p. 476:

*"When the cashier binds the bank.* We speak here only of obligations in the nature of contract.

"(a) Those acts which constitute the ordinary and customary functions of cashiers, and which he has inherent power to do, bind the bank as its own acts in favor of any person dealing with the bank and having no notice of any restriction upon the cashier.

"(b) Acts beyond this line of inherent power are the acts of the bank only by reason of express authority given by the organic law, the stockholders, or the board of directors, or by reason of the conduct of the bank or its management, in allowing the cashier to continue an open course of conduct without objection, or receiving the benefits of his act with knowledge of the facts, or otherwise ratifying his doings."

As we view the evidence, the contract was *ultra vires* as to the cashier, and, in the absence of a showing that the bank

received the benefit of his act with knowledge of the facts, or otherwise ratified his act, the bank is not bound by the unauthorized contract.

(c) There is nothing in the evidence to justify the claim of an estoppel. Nor is there anything in the evidence from which an inference might be drawn that the transaction was ever ratified by the directors. They cannot be held to have ratified a transaction of which they had no knowledge.

(d) Was the contract illegal and void because against sound public policy? It seems to us that sound public policy demands that this contract be condemned and held absolutely void. Here was a small bank managed by its regular officers. Ellingson was its president and largest stockholder. His relation to Vig, the cashier, was concededly close, and it may well have been that, as president, he exercised a considerable influence over Vig. Ellingson owned certificates of deposit issued by the bank to the amount of $30,000, which bore interest at the rate of four per cent. Feeling dissatisfied with the rate of interest, he proposed to Vig that the bank pay him seven per cent. on the certificates instead of four per cent. as paid to all other certificate holders. Vig demurred to such proposal because he believed it would violate the law. Then Ellingson suggested that Vig turn over to him, in lieu of the certificates, sixteen mortgages belonging to the bank, which Ellingson selected from the entire list of the bank's mortgages, and which bore rates of interest greatly in excess of four per cent. The contract was then entered into without consulting the board of directors and without their actual knowledge. No information regarding it was ever given to them; no record of the transaction was made on the books of the bank; no demand was made by Ellingson upon the bank to repurchase any of the mortgages assigned to him although he lived beyond the time when it was agreed that the last mortgage mentioned in the contract would be repurchased. If a bank, under such circum-

stances, can be bound by such a secret agreement, entered into between its president and cashier, an intolerable situation will result. Such a practice would be absolutely inimical to safe and sound banking, and would destroy the effect of many laws passed by the legislature for the purpose of making banks safe. If such a contract is to be approved a bank might continue for years, as the defendant bank did, wholly unmindful of a large outstanding liability of which neither its directors, nor the examiners, nor the banking commissioner had knowledge. To permit such a practice, by upholding this contract, would inevitably lead to a situation in which banks would be under constant suspicion and which would greatly impair their usefulness as safe depositories for the savings of the people. In *Hardy v. People's State Bank,* 185 Wis. 446, 201 N. W. 725, it was said, in speaking of the provisions of ch. 221, Stats., that they are "all calculated to promote safe banking, the solvency of the institution, and to enable the commissioner of banking to intelligently and expeditiously examine the affairs of the bank." To hold the contract herein valid and enforceable would be to countenance something which is inimical to sound banking, destructive of confidence in banks, violative of the spirit of the statutes of this state relating to banks, and fraught with great dangers. A president and a cashier of a bank should not be permitted to enter into such a contract unless they are fully authorized by the board of directors so to do.

That such a contract should be held void on grounds of public policy seems entirely free from doubt. In 2 Page, Contracts (2d ed.) p. 1163, it is said: "Contracts are against public policy when they tend to injure the state or the public. 'Public policy is that principle of law which holds that no subject or citizen can lawfully do that which has a tendency to be injurious to the public or against the public good.' " This court has repeatedly held that a bank is a quasi-public institution in which the public is deeply interested. *Stevens*

*v. Montfort State Bank,* 183 Wis. 621, 198 N. W. 600; *Columbia Bank v. Morgan,* 198 Wis. 476, 224 N. W. 707; *Schwenker v. Parry,* 204 Wis. 590, 236 N. W. 652. In the *Columbia Bank Case* it was said: "A bank is a quasi-public institution. The well-being of a bank does not merely concern the stockholders but the public at large, and the wrong doing which an officer of a bank might be guilty of might lead to financial disaster involving the entire local public."

This court therefore holds that this contract is illegal and void, and it will leave the plaintiff, who stands in no better position than Ellingson stood, where the latter placed himself. In *Melchoir v. McCarty,* 31 Wis. 252, at p. 254, it was said: "The general rule of law is, that all contracts which are repugnant to justice, or founded upon an immoral consideration, or which are against the general policy of the common law, or contrary to the provisions of any statute, are void; and that, if a party claiming a right to recover a debt is obliged to trace his title or right to the debt through any such illegal contract, he cannot recover, because he cannot be allowed to prove the illegal contract as the foundation for his right of recovery."

In *Lowe v. Crocker,* 154 Wis. 497, 143 N. W. 176, it was said (p. 503) : "The reason the law declares contracts contrary to public policy to be void is not for the purpose of permitting a person to retain what in equity and good conscience he ought not to retain, but to punish any party to such a contract by leaving him where he has placed himself, namely, at the mercy of the other party. Any other rule would be no check upon the making of unlawful contracts, for their enforcement upon equitable grounds would furnish as adequate a remedy as their enforcement upon legal grounds."

Having held this contract void, we deem it unnecessary to decide whether the plaintiff's claim thereunder is barred by the statute of limitations.

For the reasons stated, the judgment must be reversed and the complaint dismissed.

*By the Court.*—Judgment reversed, with directions to dismiss the complaint.

A motion for a rehearing was denied, with $25 costs, on October 13, 1931.