BROWN *v.* UNION BANKING CO.

1. FRAUD—EVIDENCE—PURCHASE OF BONDS FROM BANK.

In action against bank for alleged fraud incident to sale of bonds, record *held*, sufficient to justify finding of court that purchaser relied solely on so-called guarantee and not upon alleged false statements as to value and hence failed to establish actionable fraud.

*See 3 Comp. Laws 1929, § 13976.—REPORTER.

2. BANKS AND BANKING — BONDS—CONTRACT TO REPURCHASE —
EQUALLY DIVIDED COURT.

> Judgment for defendant in action against bank on its alleged
> contract to repurchase bonds upon purchaser's demand, be-
> cause such contract was void and contrary to public policy, is
> affirmed by an equally divided court.

Appeal from Berrien; White (Charles E.), J. Submitted October 22, 1935. (Docket No. 125, Calendar No. 38,323.) Decided March 2, 1936.

Action by Lester D. Brown against Union Banking Company to recover purchase price paid for certain bonds and for damages for fraud incident to purchase of certain others. Judgment for defendant. Plaintiff appeals. Affirmed by an equally divided court.

*Charles W. Gore,* for plaintiff.

*Fremont Evans,* for defendant.

EDWARD M. SHARPE, J. In September, 1929, the defendant banking company was a corporation engaged in the general banking business at St. Joseph, Michigan; and on September 5, 1929, sold to plaintiff bonds of the Cook County Investment Securities Company in the sum of $5,000, par value. These bonds were then owned by defendant company and were sold to plaintiff by a Mr. Zick, a teller in the bank. At the time of the purchase, Mr. Zick informed plaintiff that the bank would repurchase the bonds at any time at the option of plaintiff. About November, 1929, defendant bank repurchased $2,500 of these bonds from plaintiff; and on June 12, 1930, plaintiff again purchased $2,500 of these bonds from defendant through a Mr. Johnson, cashier of defendant bank, who at the time of this sale told plaintiff that the bonds were gilt edged and that the bank would take them back at any time plaintiff so desired.

The bank having failed to repurchase these bonds, plaintiff brought suit and contends that the bank had the right to enter into a contract to guarantee the value of the bonds or to repurchase upon demand; and further that at the time of purchase Mr. Johnson, cashier of defendant bank, falsely represented to plaintiff that the bonds were "gilt edged" so that defendant bank must respond in damages for such false and fraudulent representations.

Plaintiff claims fraud in the purchase of the second group of bonds from Mr. Johnson, the cashier of defendant bank, and it is alleged that Johnson claimed the bonds were "gilt edged." There appears to be no doubt that this statement was made. We said in *Boss* v. *Tomaras,* 251 Mich. 469, 473, the general rule is, "that a statement of value is an expression of opinion and not a basis of fraud."

If plaintiff is to recover on the basis of fraud, he must not only show that false and fraudulent representations were made, but must also show that such representations were the moving force that induced plaintiff to purchase these bonds to his damage. We do not think that plaintiff has made such a showing; on the contrary, plaintiff's testimony shows that the inducement for this purchase of bonds was the statement of Johnson that the bank guaranteed them. We quote from the record:

"*Q.* Do you want us to understand you would not have bought the last $2,500, unless the bank guaranteed them?

"*A.* I wouldn't have bought them at any price unless the bank guaranteed them; and that is what I told him.

"*Q.* When you bought that last $2,500 you relied entirely on the guarantee of the bank to take care of you?

"*A.* Yes, sir."

This testimony clearly shows that plaintiff in the purchase of these bonds relied solely upon the so-called guarantee and not upon anything said by Johnson, its cashier, as to their quality.

Plaintiff next contends that the repurchase agreement is valid, while the defense contends that plaintiff cannot recover,

(1) Because Mr. Zick, the teller, was without authority to bind the bank by a repurchase or guaranty agreement as was made in this case, and

(2) Because the agreement to repurchase is void not only because it is *ultra vires,* but because it is against the "public policy" of the State of Michigan.

In this cause the sale of these bonds in the first instance was made by Mr. Zick, the teller of the bank, and the second sale was made by Mr. Johnson, the cashier.

In both instances the record fails to show that the bank through its board of directors ever authorized either the teller or the cashier to make any such agreement or ever knew that such promises had been made, and none can be implied unless the positions of teller and cashier carry with them an implied authority to bind the bank.

In 4 Michie on Banks and Banking, p. 185, § 56, it is said, "The statement of a bank teller that an indorsement upon a check is genuine does not bind the bank, which holds him out to the public as an agent with limited powers." But plaintiff contends that the bank is estopped to claim that the agreement is *ultra vires* and cites *Crowder State Bank* v. *Ætna Powder Co.,* 41 Okla. 394 (138 Pac. 392, L. R. A. 1917 A, 1021); *People's Bank* v. *National Bank,* 101 U. S. 181; *Logan County National Bank* v. *Townsend,* 139 U. S. 67 (11 Sup. Ct. 496); *German American State Bank of Chalco* v. *Farmers & Merchants Savings Bank of Lidderdale,* 203 Iowa, 276

(211 N. W. 386); and that where the agreement to repurchase is a part of the original sale, it needs no other consideration and is valid. *Stratbucker* v. *Bankers Realty Investment Co.,* 107 Neb. 194 (185 N. W. 271).

We think these contentions bring us to the question of the public policy of the State of Michigan for banks to enter into such an agreement. If such an agreement is valid, it would create against the bank a contingent liability which would vary from day to day and could not be measured or determined. If a bank could make one such contract, it could make many and thus imperil the security of depositors by consuming the capital and surplus. Moreover, such a condition would prevent banking officials, depositors, and others desiring to do business with the bank from ascertaining its exact financial condition.

We are not in accord with plaintiff's contention that all State banking corporations have an implied authority to guarantee the payment of securities sold by them. This contention is true as to commercial paper or where a bank enters into a contract of guaranty in order to save itself from a bad debt.

In *Knass* v. *Madison & Kedzie State Bank,* 354 Ill. 554, 565 (188 N. E. 836), the court said:

"Such a transaction can scarcely be said to bear resemblance to the ordinary indorsement of a note or bill of exchange, in which banks are authorized to, and commonly do, deal, and which becomes by indorsement the obligation of the bank. The risk of complete destruction of a banking institution, and thus loss of deposits arising from the traffic in ordinary commercial bank paper by indorsement thereof is by no means comparable to the risk involved in the guaranty of a large number of real estate mortgage bonds, over which or their security the bank has no means of control. Such agreements are so fraught with danger to depositors and other creditors of the

bank that it is inconceivable that any considerable number of bankers should deem them to be in accordance with sound banking principles."

See, also, *Hawkins Realty Co.* v. *Hawkins State Bank*, 205 Wis. 406 (236 N. W. 657); *Eberlein* v. *Stockyards Mortgage & Trust Co.*, 164 Minn. 323 (204 N. W. 961); *Greene* v. *First National Bank of Thief River Falls*, 172 Minn. 310 (215 N. W. 213, 60 A. L. R. 814); *Farmers & Mechanics Sav. Bank* v. *Crookston State Bank*, 169 Minn. 249 (210 N. W. 998).

In *Reichert* v. *Metropolitan Trust Co.*, 262 Mich. 123, the trust company had engaged in the business of loaning its own money upon mortgages, and then selling participating interests in these mortgages to the public under a guaranty of payment. This court in determining whether or not a trust company had any legal right to enter into any such guaranty said:

"It was beyond the power of the trust company and against public policy, for an organization of this nature to engage in such a venture."

*Hawkins Realty Co.* v. *Hawkins State Bank, supra,* involves an attempted agreement on the part of a bank to repurchase certain mortgages at any time at par and accrued interest. The court said:

"If a bank, under such circumstances, can be bound by such a secret agreement, entered into between its president and cashier, an intolerable situation will result. Such a practice would be absolutely inimical to safe and sound banking, and would destroy the effect of many laws passed by the legislature for the purpose of making banks safe. * * *

"That such a contract should be held void on grounds of public policy seems entirely free from doubt. In 2 Page, Contracts (2d Ed.), p. 1163, it is said: 'Contracts are against public policy when they tend to injure the State or the public. Public policy

is that principle of law which holds that no subject or citizen can lawfully do that which has a tendency to be injurious to the public or against the public good.' This court has repeatedly held that a bank is a *quasi*-public institution in which the public is deeply interested."

In *Lowe* v. *Crocker*, 154 Wis. 497 (143 N. W. 176), the court said:

"The reason the law declares contracts contrary to public policy to be void is not for the purpose of permitting a person to retain what in equity and good conscience he ought not to retain, but to punish any party to such a contract by leaving him where he has placed himself, namely, at the mercy of the other party. Any other rule would be no check upon the making of unlawful contracts, for their enforcement upon equitable grounds would furnish as adequate a remedy as their enforcement upon legal grounds."

The contract in the case at bar was illegal as being *ultra vires* and contrary to the public policy of the State of Michigan.

Judgment affirmed, defendant may have its costs.

BUTZEL, BUSHNELL, and POTTER, JJ., concurred with EDWARD M. SHARPE, J.

FEAD, J. I agree with Mr. Justice EDWARD M. SHARPE that plaintiff has failed to prove actionable fraud in the purchase of June, 1930, because he did not rely upon the representations made but upon the contract for repurchase.

The testimony shows at least apparent authority in the teller of the bank to make the sale of September, 1929, with agreement to repurchase. The bank held a considerable number of bonds of the same issue. Other sales were made and the bonds repurchased by the bank, among them sales to the presi-

dent and to a director of the bank. The president had full charge of the bond register. The teller made other sales with repurchase agreement. The cashier repurchased part of the bonds sold by the teller to plaintiff and made a new sale to him with similar agreement. In so doing, he recognized that bonds of this issue were sold by the bank on "guarantee." Plaintiff dealt with the teller in the ordinary course of his business with the bank. The circumstances require the finding that the teller had authority to make the agreement for repurchase, particularly in view of the fact that the bank retained the fruits of the transaction and there was no testimony that the teller did not have such authority nor that the directors were not fully cognizant of the transaction.

"A bank may be estopped to deny the authority of an officer to do certain acts, where it has accepted the benefits of such acts or has expressly or impliedly held out that the acts were within the scope of his authority, or where the directors have acquiesced in a particular course of conduct of which the acts are a part." 7 C. J. p. 539.

"Where an officer of a bank, in selling commercial paper belonging to the bank, guarantees its payment, the retention and enjoyment by the bank of the proceeds of the transaction is a ratification of the guaranty. For the purpose of laying a foundation for a ratification, knowledge on the part of the directors of the general business of the bank may, as regards persons dealing with it, be presumed." 3 R. C. L. p. 455.

Was the agreement to repurchase void and illegal as contrary to public policy?

"It is not the policy of the law to unnecessarily restrict the right of persons to contract. When, however, the tendency of a contract, or a class of contracts, is manifestly injurious to the public inter-

est, the court will avoid them. In determining what is public policy we must advert to the Constitution, statutes and judicial proceedings." *St. Helen Shooting Club* v. *Mogle,* 234 Mich. 60, 71.

The question before us is not whether the sale of bonds by a bank with repurchase agreement is bad business or may result in loss to the bank or its depositors but whether it is contrary to the policy of the law governing banking.

The cases cited by Mr. Justice Edward M. Sharpe are readily distinguishable.

In *Eberlein* v. *Stockyards Mortgage & Trust Co.,* 164 Minn. 323 (204 N. W. 961), it was held that public policy forbids an implication that the secretary of a trust company has authority to sell a note and bonds with agreement to repurchase. The court, however, at least inferentially, held that such contract would be valid if the secretary had proper authority.

In *Farmers & Mechanics Sav. Bank* v. *Crookston State Bank,* 169 Minn. 249 (210 N. W. 998), the bank did not own the note sold but acted as a broker, and the court held that in such case an agreement to repurchase was contrary to public policy; recognizing, however, that a bank may sell and guarantee a note owned by it.

In *Greene* v. *First National Bank of Thief River Falls,* 172 Minn. 310 (215 N. W. 213, 60 A. L. R. 814), it was held that a sale of real estate mortgage, with agreement to repurchase, was in violation of the policy of congress, as disclosed by a specific statute forbidding a bank to guarantee the principal or interest of any such loan.

In *Knass* v. *Madison & Kedzie Bank,* 354 Ill. 554 (188 N. E. 836), the bonds were not owned by the bank but were sold on commission. The court held that the agreement for repurchase was *ultra vires*

as not within the scope of general banking business. But it planted finding of public policy upon a specific statute prohibiting banks from assuming payment or guaranteeing bonds and other evidences of indebtedness and any assumption of liability or guaranty whereby deposits could be jeopardized or impaired.

In *Hawkins Realty Co.* v. *Hawkins State Bank,* 205 Wis. 406 (236 N. W. 657), a sale of mortgages, made by the cashier to the president of the bank who was also the principal stockholder, with secret agreement to repurchase, not disclosed to the board of directors nor the banking department, was held against public policy. Obviously the public policy involved was the duty of persons in trust relationships.

In *Reichert* v. *Metropolitan Trust Co.,* 262 Mich. 123, we held that the sale and guaranty, as a regular business and for profit, of mortgage participation certificates by a trust company were *ultra vires;* and merely incidentally stated that it was contrary to public policy. The case is readily distinguishable. There the business imperiled the statutory security of *cestuis que trustent.* In a bank the relationship between it and a depositor is that of debtor and creditor.

In connection with the Minnesota decisions may be noted *Picha* v. *Central Metropolitan Bank,* 161 Minn. 211 (201 N. W. 315, 203 N. W. 617), where mortgages not owned by the bank were sold by the cashier under circumstances similar to those at bar and recovery against the bank on the theory of fraud was affirmed.

The public dangers from sale of bonds by banks on repurchase agreement, which the courts in other States stress in discussing public policy, may be summed up as (1) that a secret contingent liability

is created which is concealed from depositors and the public and the banking department, thereby creating suspicion and distrust of banks; (2) that such contingent liability is always fluctuating because of change in market prices, the bank has no control of the situation because it cannot require the purchaser to exercise the right of repurchase when demanded by the bank and, if carried to sufficient degree, the practice is unsafe banking, imperiling the institution and hazarding loss to depositors, whom the bank seeks to protect.

Neither good banking nor our statute prohibits the incurring of contingent liabilities. On the contrary, it is the rule, not denied by defendant, that a bank may sell commercial paper with guaranty or unrestricted indorsement. The rule is specifically recognized in 3 Comp. Laws 1929, § 11932; *Sentney* v. *Commercial National Bank,* 128 Kan. 107 (275 Pac. 1081, 67 A. L. R. 966), holds that it covers a sale of such paper with agreement to repurchase; and in *Park Falls State Bank* v. *Fordyce,* 206 Wis. 628 (238 N. W. 516, 79 A. L. R. 1339), it is held that the sale and guaranty are valid even though the guaranty may not be set up on the bank books as a contingent liability.

The danger from concealment of contingent liabilities of the bank is not present in this State. Under 3 Comp. Laws 1929, § 11915, each bank is required to make three or more reports each year to the banking department, which shall exhibit "in detail, and under appropriate heads, the resources, assets and liabilities of the bank," and copies of which reports must be published in the local newspapers. No exception is made in the statute as to report or publication of contingent liabilities. The policy of the State, therefore, is that contingent lia-

bilities shall be disclosed to the public, not that they are prohibited.

Lest this important question be determined upon unaccepted construction of the statute or upon insufficient facts or contrary to the fact, however, we have consulted the public reports of the State banking department and we find that reports from State banks are required to show "bonds sold subject to repurchase," with their details, and that in the published reports the transactions appear as liabilities under the heading, "securities sold subject to repurchase agreement," thereby demanding proper bank records, report and publicity of such transactions.

We may assume that it is the policy of the banking law to prohibit unsafe banking and to protect the depositors from loss. But we must not forget that the legislature has the power and responsibility of determining the conditions under which banks shall be conducted. When it has provided the manner in which its policy shall be conserved, it is not for the court to add to the law.

If we had a statute prohibiting guaranty of payment of securities by a bank, we reasonably could hold an agreement to repurchase securities as contrary to the policy of the statute because such agreement would be within the spirit of the statutory prohibition and substantially depart from it only in form. But we have no such statute nor has any other specific provision of the law been pointed out to indicate a policy that such agreement should be condemned.

Moreover, the bank had the right to buy and sell the bonds here involved, in the ordinary course of the banking business. Presumably, an owner may sell his property on any conditions satisfactory to himself. There was nothing inherently evil in the

transaction. It is a matter of common knowledge that, in a limited way, banks sell bonds with agreement to repurchase, particularly to persons unaccustomed to financial transactions. The banking department has recognized the existence of the practice by requiring report of it from all banks. Danger to the bank and depositors therefrom lies only if it be carried to an extreme. To split such a contract into parts, permit the bank to retain its benefits and avoid its burdens to the injury of the purchaser, is so unfair that it could be justified only by a controlling statute or the most compelling and clearly apparent considerations of a necessary public policy.

Our legislature has undertaken to prevent unsafe banking and to protect depositors by a general banking statute which encompasses the whole field of the business. It attempts to secure sound management by means of criminal penalties, assessments on stock and personal liability of stockholders on liquidation. It sets up, generally and in some respects specifically, powers, prohibitions and limitations of banks. But it does not attempt to cover in detail all possible banking transactions. It commits the general conservation of the policy of the law in the uncharted field as well as the enforcement of its specific provisions to a commissioner of the banking department.

The legislature has expressly recognized that there are transactions in which evil is not inherent but may result from excess. To avoid the danger from excess it has invested the commissioner with discretion therein; as, for example, when a bank borrows for the purpose of reloaning. 3 Comp. Laws 1929, § 11932. In the field of transactions not specifically regulated by statute the responsibility of judgment and discretion to appraise the transactions and to prevent bad banking from them is

cast upon the commissioner. He is charged with the duty of preserving the capital of the bank and, in case of its impairment, to require its restoration by assessment on the stock, 3 Comp. Laws 1929, § 11941; and under section 11959 he is further charged with the responsibility of determining whether a bank "is conducting its business in an unsafe or unauthorized manner," and if he is satisfied that it is, of taking proceedings for receivership.

Under our banking law the legislature has not condemned the transaction at bar. It has conferred upon the commissioner of the banking department both the duty and power to determine when such practice approaches unsafe banking and endangers the general policy of the law to protect depositors. It has put in his hands the remedy for evils arising out of the practice. It is not for the court to substitute itself for the officer authorized by the legislature, to substitute its judgment for his, nor to provide a different remedy from that established by the legislature.

We hold that the contract was not void as against the public policy of the State as indicated by its banking law.

It may also be noted that the courts have laid the claim of public policy solely upon protection of the public and the depositors. No court has suggested that an agreement to repurchase would be void if only the corporation itself were involved. Such situation seems almost unimaginable but it exists in this case. In 1930 defendant bank sold its business to another bank and, while the details of the sale are not of record, counsel agree that all the depositors of defendant have been paid in full.

Judgment for defendant is affirmed as to the cause of action for fraud, set up in count 2 of the

declaration. Count 1 was for damages for breach of contract. It is agreed that the measure of damages is the difference between the sale price and the value of the bonds at the time of tender and breach of contract. The testimony of value is in sharp dispute. Upon count 1 judgment should be reversed and the cause remanded for assessment of damages and entry of judgment for plaintiff. Plaintiff should have costs in the sum of one-half the cost of printing the record.

NORTH, C. J., and TOY, J., concurred with FEAD, J. WIEST, J., concurred in the result.