### In re HALSEY ELECTRIC GENERATOR CO.

(District Court, D. New Jersey. July 8, 1908.)

1. BANKRUPTCY—CREDITORS—ASSIGNED CLAIMANTS—SPLITTING CLAIMS.

 A creditor of a bankrupt may not split up his claim and assign some of the parts to other persons for the purpose of qualifying them as joint petitioners in an involuntary bankruptcy proceeding.

2. SAME—TRUSTEES OF ASSIGNORS.

 Where separate creditors of a bankrupt assigned their claims to assignees who had no financial interest in the claims, but held the same merely as trustees for their respective assignors, they were nevertheless entitled to the rights of creditors.

**3. TRUSTS—CONTRACT—CONSTRUCTION.**

W. executed a receipt reciting that he had received from H. 23,000 shares of the capital stock of a corporation to be used, together with a like number of shares to be contributed by W. and another as W. in his sound discretion should deem best, in procuring a paid-in surplus fund for the corporation of not less than $225,000, and the sum of $25,000 to be paid by W. to H. without any responsibility or obligation on W.'s part to account for the manner of disposing or holding the same. *Held*, that such agreement was unambiguous and could not be regarded as a bill of sale of any of the stock to W., but a trust agreement on his part to hold and use such stock for the purpose specified.

**4. BANKRUPTCY—CLAIMS—EVIDENCE.**

Evidence *held* insufficient to authorize the rejection of a master's finding establishing a claim for money alleged to have been loaned to a bankrupt.

**5. SAME—LIQUIDATED CLAIMS.**

A claim against a bankrupt for money loaned must be regarded as liquidated.

In Bankruptcy. On exceptions to master's report.

Riker & Riker and Howard H. Williams, for creditors.
McCarter & English and A. J. Dittenhoefer, for bankrupt.

LANNING, District Judge. This case comes before the court on exceptions to the report of the master to whom a reference was made to take testimony and report to the court on the issues made by the petitions and the answer of the alleged bankrupt. The issues are: (1) Whether the petitioners are creditors of the alleged bankrupt, (2) whether the alleged bankrupt is insolvent, and (3) whether the alleged bankrupt committed the act of bankruptcy charged. The master has reported against the alleged bankrupt on all these issues and finds that it should be adjudged bankrupt.

The petitioners are James P. Murray, Charles H. Williams, Howard H. Williams, George F. Van Slyck, and William M. Clark. The claim of Howard H. Williams was assigned to him by his father, Charles H. Williams, and constitutes but a part of the original claim of the father. Charles H. Williams is a petitioner for the unassigned part of his original claim. It is contrary to the policy of the bankruptcy act to permit a creditor to split up his claim against his debtor and assign some of the parts to other persons for the purpose of qualifying them as joint petitioners in a bankruptcy proceeding. In re Tribelhorn, 137 Fed. 3, 69 C. C. A. 601; Leighton v. Kennedy, 129 Fed. 737, 64 C. C. A. 265; In re Independent Thread Co. (D. C.) 113 Fed. 998. It follows that Howard H. Williams cannot be counted as a petitioning creditor.

It also appears that Murray and Van Slyck each hold an assigned claim, that neither of them has any financial interest in the claim held by him, and that each of them holds his claim solely for the benefit of his assignor. This fact, however, does not disqualify either of them as a petitioning creditor. The assignments were made by persons who originally claimed to be separate creditors of the alleged bankrupt for the respective amounts of the claims assigned. Murray and Van Slyck are trustees for their respective assignors, and, as they hold the legal title to the claims assigned, they are the owners of those claims,

and, if they be valid claims, are creditors. There is no dispute as to the validity of any of the claims, except that of Murray. His claim was assigned to him by Clemuel R. Woodin and is for $25,050. It is agreed by counsel that, if this be not a valid claim the Halsey Electric Generator Company is solvent, and, if it be a valid claim, that the company is insolvent and did commit the act of bankruptcy charged by the petitioners. The preliminary questions above mentioned having been disposed of, the validity or invalidity of Murray's claim is the only remaining one to be considered.

The Halsey Electric Generator Company was organized November 24, 1902, with a capital stock of $100,000, divided into 1,000 shares of the par value of $100 each. On May 13, 1903, the capital stock was increased to $10,000,000; the additional shares (99,000) being issued to Woodin for certain patents and by him divided equally among himself, James C. Haydon, and Henry Halsey. Of the 33,000 additional shares which each of these three gentlemen received, they agreed that Woodin should use 23,000 shares (or 69,000 shares in all) for the purpose of raising a surplus fund. Accordingly, Haydon and Halsey each transferred to Woodin certificates for 23,000 shares, and Woodin thereupon gave to Halsey the following written instrument:

"Received from Henry Halsey twenty-three thousand (23,000) shares of the capital stock of the Halsey Electric Generator Company to be used, together with a like number of shares to be contributed by each James C. Haydon and myself, by me as in my sound discretion I deem best in procuring a paid-in surplus fund for said company of not less than two hundred and twenty-five thousand dollars ($225,000), and the sum of twenty-five thousand dollars ($25,000) to be paid by me to said Halsey, and without any responsibility or obligation on my part to account for the manner of holding or disposing of the same. New York, May 13, 1903. [Signed]  C. R. Woodin."

Woodin made efforts to raise the desired surplus fund by operating through the Guaranty Trust Company of New York. The generator company's books show that between May 13, 1903, and April 18, 1905, he succeeded, with the aid of the trust company, in securing subscriptions for a part of the capital stock of the generator company and in raising for the surplus fund the aggregate amount of $75,187.-50. The cash book entries as to this fund are as follows:

| | | |
|---|---|---|
| May 14, 1903. Surplus, C. R. Woodin | $25,000 | 00 |
| Feb. 5, 1904. Surplus, C. R. Woodin | 25,000 | 00 |
| Nov. 15, 1904. Paid-in surplus | 5,000 | 00 |
| Dec. 1, 1904. Paid-in surplus, Guaranty Trust Co. | 10,000 | 00 |
| Mar. 24, 1905. Paid-in surplus | 10,187 | 50 |

Each of these items was posted from the cash book into the ledger book and therein credited to the account denominated the "Paid-in Surplus Account." Between May 13, 1903, and April 18, 1905, other cash receipts were entered in the cash book as follows:

| | | |
|---|---|---|
| May 13, 1903. C. R. Woodin | $2,000 | 00 |
| Nov 5, 1903. C. R. Woodin | 11 | 85 |
| Jan. 12, 1904. C. R. Woodin | 2,261 | 68 |
| Feb. 21, 1905. C. R. Woodin | 1,000 | 00 |
| Apr. 18, 1905. C. R. Woodin | 25 | 07 |

Each of these latter items was posted from the cash book into the ledger book and therein credited to the separate account of C. R.

Woodin. This account also shows cash credits to the amount of several thousand dollars previous to May 13, 1903. All these credits down to and including the one of April 18, 1905, being for $25.07, were settled long before the commencement of these bankruptcy proceedings. The account is here referred to only for the purpose of showing that before May 13, 1903, Woodin had been loaning money to the generator company which it repaid, and that after May 13, 1903, indeed beginning on that very day, other cash items were credited to him in his personal account, evidently as loans, and running along parallel with the paid-in surplus account, which was opened on May 14, 1903. This makes it clear that, so far as the books show, these two accounts were treated as wholly separate and independent. It may also be noted that the bills payable account shows that on November 30, 1904, while the two accounts above-mentioned were active accounts, the generator company gave its promissory note payable to the order of Woodin, which was by him indorsed for the accommodation of the generator company, discounted by the Guaranty Trust Company, and paid by the latter company on December 2, 1904, evidently out of the $10,000 paid into the surplus account on December 1st.

In the early part of 1905, the previous expectations of business success by the generator company had become so much impaired that no more of its capital stock could be disposed of and, consequently, that nothing more could be raised by Woodin for the surplus fund. As shown by the paid-in surplus account, the Guaranty Trust Company ceased to give its aid after March 24, 1905. Between April 18, 1905, and December 12, 1906, Woodin, however, personally paid to the generator company sundry sums aggregating $25,050. These sums he claims were loans. They constitute the basis of the claim assigned by him to Murray. The generator company contends, on the other hand, that these sums were paid to it by Woodin under the personal obligations imposed on him by the instrument of May 13, 1903. The master to whom the case was referred interprets this instrument as:

"(1) An acknowledgment of the receipt of 46,000 shares of stock of the Halsey Electric Generator Company; (2) a declaration of trust upon which the stock was received by him, 'to be used together with a like number of shares contributed by him, as in my sound discretion I deem best in procuring a paid-in surplus fund for the said company'; and (3) a disclaimer of responsibility in the following words: 'without any responsibility or obligation on my part to account for the manner of holding or disposing of the same.'"

The language of the instrument supports this construction. Plainly, it was not a bill of sale to Woodin, for it was signed only by Woodin, and related not only to stock transferred to him by Haydon and Halsey, but to stock originally issued to him by the generator company. He declared he held all the 69,000 shares of stock for a certain use, namely, for procuring a surplus fund of not less than $225,000 for the generator company and $25,000 for Halsey. Evidently, these sums were to be secured by sales of the stock. The natural and fair meaning of the instrument was that Woodin agreed to hold 23,000 shares of the stock issued to him and the 46,000 shares transferred to him by Haydon and Halsey in trust for the benefit of the generator company and Halsey. The last clause of the in-

strument, by which he declared that he would not be responsible "for the manner of holding or disposing" of the stock, must be read in connection with the previous declaration that he was to use the stock as he in his "sound discretion" should deem best for procuring the desired sums for the generator company and Halsey. When so read, that clause did not protect him against fraudulent conduct affecting injuriously the interests of the beneficiaries of the trust. It simply exempted him from liability to account to either of the beneficiaries for errors of judgment in his manner of holding or disposing of the stock. If, however, he failed to dispose of any part of the 69,000 shares, he was bound to account to his beneficiaries for the part not disposed of. To my mind the instrument is neither obscure nor ambiguous. If I am right in this conclusion, parol testimony to explain it was not admissible. It is a perfectly plain and clear trust agreement and speaks for itself.

The $75,187.50 paid into the surplus fund of the company did not pass directly through Woodin's hands, but was credited by the trust company on its books to the generator company. The $25,050 was paid to the generator company directly by Woodin and credited to his personal account on its books as the payments aggregating that sum were made. Between May 13, 1903, and April 18, 1905, as we have seen, he had advanced sundry other sums aggregating several thousand dollars which had been refunded. These advances unquestionably were treated as loans. It is not suggested by any one that they belonged to the surplus fund account. On September 13, 1905, nearly six months after the Guaranty Trust Company had ceased to render any further aid in selling the company's stock or in raising money for the suplus fund, and when the financial needs of the company had become very urgent, Woodin began from time to time to make additional payments to the company. In September he made three payments of $500 each, in October one payment of $500 and one of $200, and in November three payments of $500 each. By December 12, 1906, they had amounted to $25,050. The treasurer of the company sent to each director, including Halsey, who is the only witness disputing the claim, on the first of each month between March and December, 1905, a statement showing the company's receipts and disbursements for the preceding month. Halsey has produced the statements for March, May, June, July, August, and November, 1905, which he received. In the statement for March is an item amongst the receipts of $10,187.50 paid to the surplus fund account. It will be remembered that this is the month in which the Guaranty Trust Company ceased to give further aid to the enterprise. In none of the subsequent monthly statements produced by Halsey does anything appear as a credit to the surplus fund account. The statements for September and October are not produced. Had they been they very probably would have shown amongst the receipts from Woodin for September the sum of $1,500 and for October the sum of $700. However that may be, the statement for November does show that, amongst the receipts, the sum of $1,500 had been paid in by Woodin. It was not designated as paid-in surplus, like the item of $10,187.50 in the March statement. Notwithstanding Halsey's present contention that that $1,500 was paid

by Woodin under the terms of the instrument of May 13, 1903, and therefore belonged to the surplus fund account, he admits that he saw the item, but made no inquiry about it. He further admits that, though he frequently applied to Woodin in 1905 and 1906 for money, he never referred, either in his letters to Woodin or in his conversations with him, to the instrument of May 13, 1903, as a contract under which Woodin was personally bound to furnish at least $225,000 to the surplus fund account of the generator company. Several of his letters to Woodin are in evidence. Those of August 5, 17, and 18, and September 6, 1905, particularly show, I think, that he had not yet abandoned the hope of reviving the interest of the Guaranty Trust Company in such manner that, through its agency, further payments to the surplus fund account would be made. I find no satisfactory evidence in the case to sustain the contention that the payments by Woodin to the generator company, amounting to $25,050, should be classed with the money credited to the company by the Guaranty Trust Company. The weight of the testimony seems to me to be in favor of Woodin's claim. In any event, the master's report is not so obviously erroneous that I can, under the authorities, overturn his findings of fact.

I have not overlooked the objection that Woodin's claim is unliquidated, and that, for this reason, his assignee, Murray, cannot be a petitioning creditor. I cannot agree with this view. The amount claimed is fixed and certain. It is for moneys loaned. It is clearly a liquidated, and not an unliquidated, claim.

The exceptions will be overruled, the report confirmed, and the generator company adjudged bankrupt.

It may be added that, since this cause was argued, Woodin has presented a petition praying that he may be joined as a petitioning creditor for $1,000, being the amount which he says he paid to the generator company as an additional loan on December 12, 1906, when a general release was executed by Haydon and Halsey to Woodin releasing Woodin from all actions, claims, demands, etc. It is not necessary to consider the effect of this release, to which the company was not a party, or what connection, if any, the payment of the $1,000 had with the execution of the release. Assuming that it had none, and that it was an additional loan and not included in the claim of $25,050 assigned by Woodin to Murray, the petition must be denied for the reason, already stated, that a creditor cannot assign a part of his claim for the purpose of qualifying his assignee as a petitioning creditor, and at the same time retain the right to act as a petitioning creditor for the part not assigned.