LOWE, Respondent, vs. CROCKER, Appellant.

*September 19—October 7, 1913.*

**Contracts: Illegality: Voluntary assignment: Splitting up claims: Remedies.**

1. Plaintiff, owning a majority in amount of the claims against an assignor for the benefit of creditors, in order to procure the removal of the assignee pursuant to sec. 1702, Stats., split up his claims and ostensibly sold enough of them to secure a majority of creditors in number to sign a petition for the assignee's removal; and the assignee was removed. Defendant, to whom plaintiff had transferred one of the claims for the purpose stated, under an agreement that any dividends received thereon should be turned over to plaintiff, refused to carry out such agreement. *Held*, that as the sole purpose of the pretended sale was to enable plaintiff to obtain an unlawful advantage in the assignment proceedings, and defendant knew and acquiesced in such purpose, the whole agreement was void as against public policy.

2. The sale being colorable only and the very purpose and gist of the agreement being a fraud upon the court and the other creditors, the contract cannot be separated into a lawful and an unlawful part, but is wholly void; and the court will leave the parties where it finds them.

APPEAL from a judgment of the circuit court for Clark county: F. C. ESCHWEILER, Judge. *Reversed.*

Action for money had and received. In the latter part of December, 1897, the Clark County Bank, of which plaintiff was a director, became insolvent, and assigned its resources and assets to plaintiff as security for its indebtedness to him. Plaintiff claimed that amongst such assets was a note, indorsed by one George Huntzicker, who had made a voluntary assignment of his property for the benefit of his creditors to his nephew, Henry Huntzicker. Plaintiff owned a majority, in amount, of the claims against George Huntzicker, and was desirous of getting the consent of a majority, in number, of the creditors to remove the assignee, Henry Huntzicker,

pursuant to the provisions of sec. 1702, Stats. 1911. This he was unable to do, and as the court refused to remove the assignee for cause, he realized he would fail unless he could secure a consent of the majority in number of creditors. For the purpose of procuring the removal of the assignee, the then attorney for plaintiff advised him to ostensibly sell a number of his claims to others and have them file claims in their own name and join in a petition for removing the assignee. The attorney, with the knowledge and consent of plaintiff, went to the defendant, asked him to purchase one of the notes against George Huntzicker, and told him the reason for it. He made the bargain with the defendant, and it was agreed that the latter should file a claim in his own name and turn over to plaintiff the whole dividend that might be received on the note. Like agreements were made with several other persons. The defendant filed a claim in his own name prepared for him by the then attorney for plaintiff; and afterwards, in pursuance to a suggestion made by plaintiff to defendant before the alleged sale of the note, the defendant was appointed assignee in place of Henry Huntzicker, who was removed. On the final settlement defendant received a dividend on this note amounting to $120.60, which the plaintiff seeks to recover in this action.

Defendant denied that he made the agreement claimed by plaintiff, and his evidence was to the effect that the note was given him by one Klopf, the cashier of the Clark County Bank, as security for a sum of money, the precise amount of which he said he did not remember, which the bank owed him, and that he was the owner of the note and was entitled to the dividend that was finally paid thereon on the settlement of the George Huntzicker assignment.

The court submitted to the jury the question of the ownership of the note and instructed them to find for plaintiff if they found the agreement was as claimed by him. The jury brought in a general verdict for the plaintiff, assessing his

damages in the sum of $122.92. From a judgment entered thereon the defendant appealed.

For the appellant there was a brief by *S. M. Marsh* and *Homer C. Clark,* and oral argument by *Mr. Marsh.*

For the respondent the cause was submitted on the brief of *R. F. Kountz.*

VINJE, J. The jury must have negatived the claim made by the defendant as to how he became the owner of the note, and found that the agreement was as shown by plaintiff's evidence. This raises the question of whether the plaintiff is entitled to recover under such an agreement. He was unable to secure the removal of the assignee for cause, and he was equally unable to procure the consent of the majority of the creditors in number to join in a petition for his removal under sec. 1702, Stats. 1911. No lawful way of removing the assignee was open to plaintiff. But he wanted him removed. In this dilemma the person who was his attorney at that time, but is not now, conceived the scheme of splitting up plaintiff's claims and ostensibly selling enough of them to secure a majority of creditors in number to sign a petition for the removal of the assignee. This scheme was undoubtedly carried through, for, though it does not appear by the evidence in this case directly that the defendant, or any of the others to whom claims were likewise ostensibly sold, signed a petition for the removal of the assignee, it does appear that the assignee was in fact removed and defendant appointed in his place. It also appears that the attorney then acting for the plaintiff informed the defendant and the others of the purpose of the proposed sale. He says: "I made the bargain with *Mr. Crocker* and what was to be done, and with the other creditors who received notes." And again, after testifying that he was acting for, and with the consent of, the plaintiff, he said: "And I went to *Mr. Crocker* and Rella Balch and it seems to me there was some others,

Tragsdorf, and I asked them to purchase one of these notes; told them the reason for it; wanted them to file a claim with the estate of Huntzicker, and I made the bargain with *Mr. Crocker* that he was to take from *Mr. Lowe* one of these $500 notes and that he was to file a claim on it, and that whatever he received on the claim after it was allowed he was to pay to *Mr. Lowe.* *Mr. Crocker* agreed to that and I prepared his claim for him." It thus appears that, according to the finding of the jury sustaining the claim of plaintiff as to what the agreement was, the defendant knew and acquiesced in the purpose of the ostensible sale.

The trial court was evidently of the opinion that plaintiff could recover under the agreement, for he ordered judgment in his favor. It is urged that this ruling was correct, because plaintiff had the right to sell the note and defendant had the right to buy it, and they agreed upon the amount of the consideration and when it should be paid, and that this constitutes a complete, lawful contract, and the court, it is said, cannot inquire into the purpose of the transaction and declare it void because such purpose may be an illegal one. Were this true, many crimes would go unpunished. It is often the purpose or intent of an act that characterizes it, and makes that unlawful which would otherwise be lawful. The field of fraud would be practically unlimited were such a rule to obtain. It is also urged that the unlawful part, namely, the purpose for which the sale was made, is separable from the lawful part, which was the reciprocal agreement to sell and buy for an agreed consideration. One difficulty with such contention is that it assumes that a sale was actually made. When the whole transaction is viewed in the proper light it becomes apparent that the sale was colorable only, vesting in the defendant the apparent but not the real ownership of the note. The defendant had no real interest in the amount of the dividend recovered. He was obliged to pay only what he received. He did no more than to allow his name to be used

for the purpose of misleading the court as to the number of creditors. Nor is the agreement capable of being severed into a lawful and an unlawful part. The very purpose and gist of it was a fraud upon the court and the other creditors, though it does not appear the creditors were damaged thereby. It does not come within the rule announced in *Nat. D. Co. v. Cream City I. Co.* 86 Wis. 352, 56 N. W. 864, for the illegality here is not collateral to, but bound up in, the agreement itself. The same distinction applies to the cases of *Armstrong v. American Exch. Nat. Bank,* 133 U. S. 433, 10 Sup. Ct. 450; *Woodworth v. Bennett,* 43 N. Y. 273; and *Wright v. Pipe Line Co.* 101 Pa. St. 204, cited by counsel for respondent. In the case of *Woodworth v. Bennett, supra,* plaintiff did not have to trace his right through any illegal contract whatever. It is elementary law that if illegality permeates a contract so that it furnishes the reason for it and the foundation upon which it rests, then the whole contract is void and courts will leave parties where they find them.

In the present case it is evident that the sole purpose of the pretended sale was to enable plaintiff to obtain in the assignment proceedings an advantage that he could not otherwise gain. His object was to so manipulate his claims that it could be made to appear to the court that a minority in number of the creditors constituted a majority. This object was known to and acquiesced in by the defendant. Such contracts are void on the ground of public policy, for they interfere with the administration of justice. In *Melchoir v. McCarty,* 31 Wis. 252, 254, it was said:

"The general rule of law is, that all contracts which are repugnant to justice, or founded upon an immoral consideration, or which are against the general policy of the common law, or contrary to the provisions of any statute, are void; and that, if a party claiming a right to recover a debt is obliged to trace his title or right to the debt through any such illegal contract, he cannot recover, because he cannot be al-

lowed to prove the illegal contract as the foundation for his right of recovery."

In his work on Public Policy, p. 152, Greenhood states the rule thus:

"Any contract which has for its object the practice of deception upon the public or public officers, or upon any party in interest as to ownership of property, financial condition, the nature of a transaction, the indebtedness of a bankrupt, or of an estate, the responsibility assumed by an obligation, the personal condition of the parties, . . . or which is made in order to consummate a fraud upon the people, or upon the public treasury, or upon third persons, is void."

Substantially the same rule is stated by Pingrey in his treatise on Extraordinary Industrial and Interstate Contracts, sec. 282, as follows:

"All agreements for pecuniary consideration to control the regular administration of justice are void as against public policy, regardless of the good faith of the parties, and without reference to the question as to whether improper means are contemplated or used in their execution. . . . All agreements relating to the proceedings in the courts, which may involve anything inconsistent with the full and impartial course of justice therein, are void."

The purpose of sec. 1702, Stats. 1911, was to enable a majority in number as well as in amount of *real* creditors to control the removal of an assignee. Only real creditors are interested in the efficient and economical management of the estate. If claims were permitted to be split up and fictitious creditors added at pleasure, then the beneficent purpose of the law would be frustrated by agreements such as we have before us. Under similar federal statutes it has been held that creditors cannot split up their claims in order to increase the number of creditors, because such an attempt to contravene a statute is contrary to public policy. *In re Burlington M. Co.* 109 Fed. 777; *In re Independent T. Co.* 113 Fed. 998;

*Leighton v. Kennedy,* 129 Fed. 737; *In re Halsey E. G. Co.* 163 Fed. 118; *In re Lewis F. Perry & W. Co.* 172 Fed. 745.

The reason the law declares contracts contrary to public policy to be void is not for the purpose of permitting a person to retain what in equity and good conscience he ought not to retain, but to punish any party to such a contract by leaving him where he has placed himself, namely, at the mercy of the other party. Any other rule would be no check upon the making of unlawful contracts, for their enforcement upon equitable grounds would furnish as adequate a remedy as their enforcement upon legal grounds.

The conclusion reached on the merits of the case renders it unnecessary to consider the other assignments of error.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment for defendant.