BRIGGS COMMERCIAL & DEVELOPMENT CO. *v.* FINLEY.

1. CONTRACTS—PUBLIC POLICY—PARTIAL REPUDIATION—STATUTES.
   There is no public policy which permits persons or corporations to retain advantages and repudiate the obligations which produce them, except when the transaction is condemned as immoral or by positive statute and the only method of rendering the law effective is to leave the parties where they put themselves.

2. BANKS AND BANKING—STATUTES—PUBLIC POLICY.
   Every banking statute does not raise a public policy which wholly condemns a transaction.

3. SAME—TRUST COMPANY—REALTORS—UNJUST ENRICHMENT—SINGLE AND ISOLATED TRANSACTION.
   Liquidating trustees of trust company which had made extensive loans to realtor, had acted as his fiscal agent for many subdivisions he had developed and held his interest in subdivision involved as security for loans and advances made to him *held,* liable in action of assumpsit on its guaranty for full amount of notes issued by realtor, to plaintiff for sum borrowed to buy up outstanding prior lien where trust company obtained a direct enrichment from a single and isolated transaction in excess of amount involved in its agreement with plaintiff.

BUTZEL, BUSHNELL, and SHARPE, JJ., dissenting.

Appeal from Wayne; Nicol (Henry G.), J. Submitted June 16, 1937. (Docket No. 119, Calendar No. 39,595.) Decided December 29, 1937. Rehearing denied February 25, 1938.

* Continued from Vol. 282.

Assumpsit by Briggs Commercial & Development Company, a Michigan corporation, against Edward B. Finley, Jr., Millard E. Bowlus and Edwin A. Edwards, liquidating trustees of Union Guardian Trust Company, a Michigan corporation, on contract to purchase notes. Judgment for plaintiff. Defendants appeal. Affirmed.

*Beaumont, Smith & Harris* (*Lewis S. Robinson*, of counsel), for plaintiff.

*Jason L. Honigman* (*Milton J. Miller*, of counsel), for defendants.

FEAD, C. J. I think the judgment should be affirmed.

Wholly aside from the views expressed in *Brown* v. *Union Banking Co.*, 274 Mich. 499, I find no trace of a public policy applicable here. There was no statute expressly prohibiting the transaction and which would be nullified if any semblance of recovery were permitted the plaintiff on any theory, as was the situation in *Awotin* v. *Atlas Exchange National Bank of Chicago*, 295 U. S. 209 (55 Sup. Ct. 674), where there was a sale of bonds with agreement to repurchase in direct violation of the national banking law.

The Union Guardian Trust Company received an affirmative enrichment by the transaction, in the form of greater security for Harrah's obligations to it, and it would be grossly unjust to permit it to retain such advantage and repudiate the agreements by which it was obtained. In the *Awotin Case* no such condition appeared, the bank received no affirmative benefit in the form of a gain of assets, but, on the contrary, it assumed contingent liabilities.

There was no statute expressly forbidding the agreement at bar. There is no public policy which permits persons or corporations to retain advantages and repudiate the obligations which produce them, except when the transaction is condemned as immoral or by positive statute and the only method of rendering the law effective is to leave the parties where they put themselves. Every banking statute does not raise a public policy which wholly condemns a transaction. If it were otherwise, then a customer who borrows more money than the bank is entitled to loan him would not need to pay his debt.

The case falls within *Citizens Central Nat. Bank of New York* v. *Appleton,* 216 U. S. 196 (30 Sup. Ct. 364), where, although in violation of the national banking law, a bank guaranteed payment of a customer's note at another bank where the loan from the latter was made to enable the customer to pay his note at the bank making the guaranty. The court recognized the invalidity of the contract as in violation of the statute but held that recovery could be had for money had and received, at least to the amount that the bank of guaranty had received from the loan.

Another distinction that could be made is that the transaction at bar was a single and isolated one, and could be approved under *Ter Keurst* v. *First State Bank,* 271 Mich. 259, which should be read in connection with *Brown* v. *Union Banking Co., supra,* in order to appreciate the distinction between general and isolated transactions.

As the direct enrichment of the Union Guardian Trust Company from the transaction was of value in excess of the amount involved in its agreement with plaintiff, plaintiff is entitled to judgment for the full amount thereof, with costs.

NORTH, WIEST, POTTER, and CHANDLER, JJ., concurred with FEAD, C. J.

BUTZEL, J. (*dissenting*). Charles W. Harrah of Detroit, a realtor, was heavily interested in subdivision property located either in or near the city of Detroit. The Union Trust Company, which subsequently became the Union Guardian Trust Company, acted as fiscal agent and trustee of his many subdivisions. It looked after the collection of payments on land contracts for the sale of lots in the subdivisions, and also made certain expenditures for Harrah. It made large loans to Harrah, which were partly evidenced by notes but in the main consisted of overdrafts on an open account. The trust company, for payment of the open account, largely relied on collections from the land contracts. On March 1, 1929, Harrah's total indebtedness to the trust company amounted to approximately $710,000, of which $200,000 was evidenced by Harrah's notes and the balance consisted of advancements. The trust company held as security Harrah's interest in the subdivisions. He had interested John M. Mulkey and others, herein called the Mulkey group, in one subdivision known as "C. W. Harrah's 3-Mile, No. 2 Subdivision," in Allen Park, Michigan. The Mulkey group had advanced $50,000 with which to make a down payment to the fee owners of the property. It was agreed that the moneys received on sale of the lots were to be deposited with the Union Trust Company or some other bank for the time being, that all disbursements be made by check drawn on the trust company, and that, in consideration of the advances by the Mulkey group, the latter were to be repaid the $50,000 together with a $50,000 bonus prior to any division of moneys between the parties. Thereafter Harrah and the Mulkey group

were to divide evenly any further net proceeds from the subdivision.

Subsequently, the Mulkey group agreed to accept $65,000 in full for their interest in the subdivision and Harrah asked the Union Trust Company, through its vice-president and secretary, Merrill C. Adams, to advance the required amount. The loan was refused, not because Harrah's credit was poor, or that his prior indebtedness was not properly secured, but because the trust company thought his loan was as large as it cared to make to one individual. Harrah thereupon enlisted the aid of Briggs Commercial & Development Company, plaintiff. It was willing to make the loan upon proper security. As a result of negotiations, Mr. Adams, as vice-president and secretary of the trust company, wrote the following letter to plaintiff under date of February 28, 1929:

"Union Trust Company

February 28, 1929.

"The Briggs Commercial & Development Co.,
"1800 Buhl Building,
"Detroit, Michigan.

"*Gentlemen:*

"It is our understanding that C. W. Harrah has negotiated a loan with your company to enable him to purchase from J. M. Mulkey and his associates their one-half interest in C. W. Harrah's Three Mile No. 2 Subdivision, the loan to be granted him on the following terms:

"Amount of loan .................$65,000.00
Interest rate 6 per cent. payable s/a—
Maturity of Principal
Note due 3½ years from date...... 3,250.00
Note due 4 years from date........ 3,250.00
Note due 4½ years from date...... 3,250.00
Note due 5 years from date........ 55,250.00

$65,000.00

it being understood, however, that General Harrah shall be privileged to make payment in full at any time prior to the maturity of the notes.

"It is our opinion that collections on the subdivision above mentioned, which General Harrah will own in its entirety if this loan is made, will be sufficient to meet the required payments of interest and principal on his loan as they mature. We agree, however, in the event that these notes are not paid as they shall mature or in the event that the interest payments are not made as they become due, to purchase the notes at face value plus accrued interest.

Yours very truly<br>
M. C. ADAMS,<br>
Vice-Pres. and Sec'y.

"MCA :D        Approved by Counsel,
R. H. C."

Upon receipt of the letter, the plaintiff wrote that it was making the loan upon the basis of assurances contained in the letter. On November 1, 1929, interest not having been paid, plaintiff wrote the trust company calling its attention to the default and also its letter of February 28, 1929. Some question arose as to the legality of the transaction and counsel were consulted. It finally resulted in the trust company on November 25, 1929, writing as follows to plaintiff:

"UNION TRUST COMPANY<br>
November 25, 1929.

"Briggs Commercial and Development Co.,
"1800 Buhl Building,
"Detroit, Michigan.
"*Dear Sirs:*

"In connection with our letter of February 28, 1929, in which we agree to purchase the notes of C. W. Harrah held by you, we wish to assure you that sufficient consideration moved to us in this

transaction to support our undertakings in said letter and that our relationship and business dealings with General Harrah were such that we are benefited by this loan, and had you not made it we would have felt obligated to have advanced the money to him ourselves.

"If you accept the interest tendered to you at this time, and if in the future, you will send us notice of interest and/or principal payment dates in line with customary business practice, we agree to waive any and all technical defenses which we might have to any valid claim which you may reasonably make under the terms of our letter of February 28, 1929.

"Yours very truly,

John N. Stalker,

Executive Vice-President."

"JNS :D

When the letter of February 28, 1929, was received by plaintiff, it gave Harrah a check for $63,050, in return for Harrah's notes for $65,000, as set forth in the letter, the sum of $1,950, being a bonus charged by plaintiff. Proceeds of the loan were received by the trust company and placed to Harrah's credit on the open account with the trust company and a few days later $59,808 was disbursed from this account to buy out the Mulkey group, and on the same day other disbursements were made from the account so that Harrah's debit to the trust company again was further increased by approximately $8,000. By these transactions, Harrah's interest in the subdivision was released from a prior claim of $100,000 and he also gained a half interest previously held by the Mulkey group in the equity in the subdivision and the proceeds from the sale of lots therein.

Appellant contends that Adams, as vice-president and secretary of the trust company, did not have the authority to execute the letter of February 28,

1929. Adams testified that he acted with the approval of the president and the executive vice-president of the company, the latter writing the supplemental letter of November 25, 1929, with the knowledge and consent of the president of the company; that he was authorized to make loans independently for the trust company and to bind it by an agreement which would incidentally benefit the collateral loan then held by the trust company. The agreement was not submitted at the time to any executive committee or board of directors. Only one note held by plaintiff was paid.

The trust company subsequently failed and plaintiff brought suit on the agreement to purchase against the liquidating trustees of the trust company for the sole purpose of establishing its claim to participate, as a general and not as a preferred creditor, in any dividends that might be paid. The trial judge rendered judgment for plaintiff for the full amount claimed by it.

There was a mortgage on the subdivision of $413,800 due the former owners. Land contracts, having an aggregate face value of $175,127.90, were transferred to the mortgagee in full settlement of the mortgage indebtedness. A large amount has already been netted by the trust company from the subdivision collections and passed to Harrah's credit, but additional large advances were made to him. He subsequently went into bankruptcy, owing the trust company approximately a million dollars. The trust company released its claim against the bankrupt's estate as it believed it could not expect any dividends. At the bankruptcy sale in 1935, defendants purchased Harrah's equity in all of his subdivisions for $1,200, or thereabouts.

At the trial of the case, defendants claimed that the agreement of February 28, 1929, to purchase the

notes in event of default, was *ultra vires* and was also illegal, it being against public policy for a trust company to guarantee notes of third parties. Other questions raised as to the authority of the officers need not be considered.

In view of the fact that the moneys received from the plaintiff were shown to have been used to extinguish a lien of $100,000 prior to that of Harrah and that the trust company benefited thereby, counsel were asked to file additional briefs on the following questions: Even if the agreement on the part of the trust company was *ultra vires,* should not plaintiff nevertheless have some equitable remedy to recover dividends on the moneys collected by the trust company from the subdivision and applied on Harrah's account, which moneys would otherwise have gone to the Mulkey group? Should not plaintiff have a lien on the remaining lots of the subdivision for the moneys it advanced? And should not the case be transferred to the equity side of the court to determine these questions?

The trial court rendered a judgment for the full amount of the notes and interest against the defendant. While there may be some strong equity in plaintiff's favor, it has been the policy of the law, as expressed in our previous opinions, and borne out also by cases in other jurisdictions, that when an agreement is against public policy, a plaintiff has no redress whatsoever, at least until all the other creditors are paid in full.

The guaranteeing of the notes of a third party by a trust company is so far beyond the power of the company and so dangerous and prejudicial to the rights of the *cestuis* of a trust company, that it needs no extended comment on our part to show its illegality. We have previously passed upon the question in *Reichert* v. *Metropolitan Trust Co.,* 262

Mich. 123, and *Brown* v. *Union Banking Co.,* 274 Mich. 499. See, also, *Knass* v. *Madison & Kedzie State Bank,* 354 Ill. 554 (188 N. E. 836); *Nowell* v. *Equitable Trust Co.,* 249 Mass. 585 (144 N. E. 749); *Lowe* v. *Crocker,* 154 Wis. 497 (143 N. W. 176); *Commercial Nat'l Bank* v. *Pirie,* 27 C. C. A. 171 (82 Fed. 799); *Farmers & Mechanics Savings Bank* v. *Crookston State Bank,* 169 Minn. 249 (210 N. W. 998).

In the case of *Ter Keurst* v. *First State Bank,* 271 Mich. 259, relied upon by appellee, we called particular attention to the fact that it consisted of a single transaction for the purpose of settling threatened litigation. In the instant case, the transaction was not entered into for the purpose of settling present litigation, nor does the letter of November 25, 1929, bring it within that category. At the time the letter of November 25, 1929, was written, the legality of the transaction was already questioned. A contract against public policy cannot be ratified by writing a letter withdrawing objections to that which is illegal and forbidden by law. That which the law forbids cannot be legalized in such manner by the parties. The claimed inequity, which plaintiff alleges it will suffer if denied recovery, has made us hesitate, but again we are bound by a rule of law. If the law prohibits a contract as a matter of general public policy, it cannot be legalized by ratification. *Turner* v. *Schmidt Brewing Co.,* 278 Mich. 464.

In *Brown* v. *Union Banking Co., supra,* in quoting with approval from *Lowe* v. *Crocker, supra,* we stated that anyone entering into an illegal contract should be left where he had placed himself. Under any other rule, enforcement of the contract upon equitable grounds would furnish as adequate remedy as enforcement upon legal grounds.

In *Awotin* v. *Atlas Exchange Nat'l Bank of Chicago*, 295 U. S. 209 (55 Sup. Ct. 674), the court said:

"The invalidity of the contract was not due to the mere absence of power in the bank to enter into it, in which case restitution, not inequitable to the bank or inimical to the public interest, might be compelled. * * * The contract is invalid because it is within the broad sweep of the statute which by mandatory language sets up definite limits upon the liability which may be incurred by a national bank, in the course of its business of dealing in securities, by confining the business to buying and selling 'without recourse.' The phrase is broader than a mere limitation upon the power to contract, although embracing that limitation. It is a prohibition of liability, whatever its form, by way of 'recourse' growing out of the transaction of the business. * * * National banks are public institutions and the purpose and effect of the statute is to protect their depositors and stockholders and the public from the hazards of contingent liabilities, attendant upon the assumption by the bank of the risk of loss by its customers, resulting from the permitted dealing in securities by the bank. The prohibition would be nullified and the evil sought to be avoided would persist, if, notwithstanding the illegality of the contract to repurchase, the buyer, upon tender of the bonds, could recover all that he had paid for them. Such a construction of the statute is inadmissible."

In *Richardson* v. *Buhl*, 77 Mich. 632, 661 (6 L. R. A. 457), this court stated:

"Courts will take notice, of their own motion, of illegal contracts which come before them for adjudication, and will leave the parties where they have placed themselves."

Also, see, *Benson* v. *Bawden*, 149 Mich. 584 (13 L. R. A. [N. S.] 721); *Reichert* v. *Metropolitan Trust Co., supra; Turner* v. *Schmidt Brewing Co., supra.*

In coming to our conclusion, we are not unmindful of the statement in the letter of February 28, 1929, that the collections from the subdivision "which General Harrah will own in its entirety * * * will be sufficient to make the required payments of interest and principal on his loan." Harrah did not see fit to use these collections to pay off his notes and it was beyond the power of the trust company to agree to make such payments in the event of Harrah's default.

The judgment should be reversed, with costs to defendants.

BUSHNELL and SHARPE, JJ., concurred with BUTZEL, J.