## BLOSSOM FARM PRODUCTS COMPANY,
Plaintiff-Appellant and Cross-Appellant,†

v.

## KASSON CHEESE COMPANY, INC., Defendant-
Respondent and Cross-Appellant.

Court of Appeals

*No. 85–2064. Submitted on briefs June 19, 1986.—Decided
September 17, 1986.*

(Also reported in 395 N.W.2d 619.)

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

For the plaintiff-appellant and cross-respondent, the cause was submitted on the briefs of *Jerome E. Lynch*, of *Sauer, Becker, Flanagan & Lynch, Ltd.* of La Crosse.

For the defendant-respondent and cross-appellant, the cause was submitted on the brief of *I. Gregg Curry IV* of *McCarty, Curry, Wydeven, Peeters & Riester* of Kaukauna.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

SCOTT, C.J.   Blossom Farm Products Company (Blossom) appeals from a judgment dismissing its suit on an open-account contract for $138,306 owed by defendant Kasson Cheese Company, Inc. (Kasson) for its last purchase of Isokappacase.[1] Blossom contends

---

[1] A brief description of the properties and uses of Isokappacase will help clarify the legal issues regarding Kasson's use of the product. Isokappacase, manufactured by Marvin T. Silverman, president of PTX, was designed for two purposes: (1) as a starter medium; and (2) as a bacteriophage preventive. When used as a starter, Isokappacase would be added to milk, pasteurized with the milk at high temperatures, and innoculated so as to grow a culture that would be put into cheese. When used in this way, the protein in Isokappacase serves a dual purpose: (1) stimulation for nutrient purposes (growth

that the trial court was in error when it concluded that the contract was illegal and unenforceable. Blossom argues that the contract for the sale of Isokappacase was not illegal because use of a yield-enhancing agent in cheese by Kasson was not illegal, even though Blossom knew Kasson was misbranding the product and selling it as real cheese.[2] In its cross-appeal, Kasson contends

---

of bacteria); and (2) production of extra yield in the starter medium. For this use, the protein level on a dry basis need be less than 2% or 3% of the total solids of a medium.

If needed as a bacteriophage preventive, Isokappacase protects a specific strain of organism from being killed off by a virus. Because bacteriophage preventive is an insignificant problem with mozzarella and provolone, Kasson's need for Isokappacase as a phage preventive would have been minimal.

A third use for Isokappacase was as a yield enhancer whereby the powder had to be put directly into the *cheese milk*. An important distinction exists between milk and cheese milk. When Isokappacase is used as a starter, it is mixed with milk to begin the starter culture which, in turn, is introduced into the cheese milk. When Isokappacase is introduced directly into cheese milk and is not used in the starter medium to stimulate the growth of bacteria, it is used as a yield enhancer.

Because Isokappacase contains more than 75% protein or caseins, its direct introduction into the cheese milk substantially increases the amount of protein so as to get additional cheese yield to cover the cost of the Isokappacase. When Isokappacase is used as a yield enhancer, however, the resulting product must: (1) be labeled a cheese "analog," an imitation cheese, or a name other than real cheese; and (2) list the ingredients in the end product to reflect the larger percentage of protein or caseins characteristic of imitation cheese.

[2] "Real cheese" must comply with the Federal Standards of Identity as found in 21 CFR, secs. 101.2, 101.3, 133.155 and 133.181 (1986). Wisconsin adopted the federal standards of identity regarding misbranding of food. *See* secs. 97.03 and 97.09, Stats.

that the contract between Blossom and Kasson was illegal because Blossom knew, not only that Kasson's product was labeled illegally, but it participated in and benefited from the illegality.

The trial court held that the contract was illegal and unenforceable because both parties knew and benefited from Kasson's "illegal use" of Isokappacase. Because we conclude that enforcement of the contract is against public policy, we affirm the trial court's refusal to enforce the contract.

The dispositive issues on appeal are: (1) whether there is sufficient evidence in the record to support the trial court's findings of fact; and (2) whether the contract between Blossom and Kasson regarding the sale and purchase of Isokappacase is unenforceable.

Julian Podell, a salesman at Blossom, was sole United States distributor for PTX Food Corporation's (PTX) production of Isokappacase. Blossom sold this product to Kasson from August 1981 until February 13, 1984. The label on Isokappacase indicated that the product was a "starter media, a bacteriophage preventive medium." In fact, however, because Isokappacase contained more than 75% caseins or protein, its composition was characteristic primarily of a yield enhancer. Kasson introduced the Isokappacase directly into the cheese milk to enhance cheese yields from milk but did not label its final product as imitation cheese as required by federal standards.

Blossom was aware of the fact that Kasson's extremely large volume purchases of the product could only be accounted for by Kasson's use of Isokappacase

as a yield enhancer. Both Kasson[3] and Blossom[4] bene-fited economically from this volume purchase and use. When Kasson stopped using Isokappacase as a yield enhancer, PTX stopped making the product.[5] Further facts will be discussed as needed.

Generally, if a promisee has substantially per-formed its part of the contract, enforcement of a prom-ise is not precluded on grounds of public policy because of some improper use that the promisor intends to make of what he obtains; however, if the promisee acts for the purpose of futhering the promisor's improper use, the promisee is barred from recovering. Restatement (Sec-ond) of Contracts § 182 (1981). Whether the promisee has acted for such purpose is a question of fact which may be evidenced by the promisee's "doing of specific acts to facilitate the promisor's improper use" and/or "a course of dealing with persons engaged in improper con-duct." *Id.* at comment b. A court engages in a balancing process to determine factually if the improper use or

---

[3] Kasson's yield with the use of Isokappacase was 2.8 pounds of cheese per pound of Isokappacase.

[4] Blossom's list of shipments of Isokappacase to Kasson from August 1981 to February 13, 1984 records a total of 2,699,200 pounds. After the initial order of 20 fifty-pound bags of Isokappa-case, the majority of orders were for 840 fifty-pound bags (42,000 pounds total per order) for a cost of $71,820 per order. Podell testi-fied that two 42,000 pound shipments were missing from the record. As a result of these volume sales, Blossom grossed in excess of $5,000,000.

[5] Kasson stopped its use of Isokappacase approximately three weeks after its receipt of a letter from the Wisconsin Department of Agriculture, Trade and Consumer Protection, stating that protein concentrate or caseins were "illegal ingredients" if added to cheese and would result in an "adulterated" product.

conduct at issue is unenforceable on grounds of public policy. *Id.* at § 178 and § 182 comments a and b.

The trial court held the contract "illegal and unenforceable." We restrict our holding to whether the contract is unenforceable. Our position is in keeping with the Restatement at §§ 178 and 182, which deal with the issue in terms of "unenforceability" rather than "illegality."

We turn to the Restatement because the Wisconsin cases relied on by the parties do not distinguish between illegal contracts which are unenforceable and legal contracts which contravene public policy and are thus unenforceable. *See Kryl v. Frank Holton & Co.*, 217 Wis. 628, 259 N.W. 828 (1935); *Lowe v. Crocker*, 154 Wis. 497, 143 N.W. 176 (1913). Despite some confusion in these cases regarding this distinction, we read these cases to be consistent with our decision and support our extension of this distinction, in keeping with the Restatement.

## SUFFICIENCY OF EVIDENCE

■

We must first determine whether sufficient facts exist in the record to support the trial court's findings of: (1) Kasson's improper conduct; and (2) Blossom's knowledgeable involvement with Kasson. Findings of fact by a trial court "shall not be set aside [on appeal] unless clearly erroneous . . . ." Section 805.17(2), Stats. We conclude sufficient facts exist on both points.

Blossom, as promisee, performed its part of the contract; it delivered the $138,306 shipment of Isokappacase to Kasson. Blossom's contract to sell Isokappacase to Kasson was legal; use of a yield enhancer is legal

as long as the end product is properly labeled as an imitation or analog cheese with the concomitant ingredient line listed. Only when a promisor, such as Kasson, intends to use Isokappacase as a yield enhancer and sell its end product as a real cheese that purportedly conforms to federal standards of identity does the use of Isokappacase become improper.[6]

Even with Kasson's intended purpose of improperly labeling its end product, enforcement of Kasson's promise to pay Blossom for sale and delivery of the Isokappacase would not be precluded on grounds of public policy without knowledgeable involvement by Blossom. Testimony from several parties provides sufficient evidence of Blossom's knowledgeable involvement in Kasson's improper conduct.

Podell testified that Blossom knew Kasson was using Isokappacase as a yield enhancer. Podell acknowledged that once he recognized that Kasson was ordering about one hundred times more Isokappacase than would be needed if it were using the product as a starter medium, he realized that such large volume orders could only mean that Kasson was using the product as a yield enhancer.[7]

---

[6] Had Kasson labeled its end product as "mozzarella or provolone cheese analog" or any other comparable label indicating an imitation cheese and listed ingredients so as to remove itself from the requirements of the federal standards of identity, it would have been able to sell its end product for only 70¢ per pound rather than the $1.40 per pound it received for selling it as real cheese.

[7] Had Kasson been using Isokappacase as a starter media, it would have had to have used nearly a billion pounds of milk per month to achieve the correct proportion; rather, Kasson was using only approximately 60,000,000 pounds of milk per month, a fact which Podell knew. Hence, the small volume of milk and the large volume of Isokappacase used would necessarily lead one familiar

Likewise, Marvin Silverman, president of PTX, testified that while he sold 100% of its production of Isokappacase to Podell who, in turn, sold over 90% to Kasson, he did not know the exact percentage Blossom sold to Kasson because Podell kept "a secret list, confidential." Silverman also testified that he knew Kasson was putting Isokappacase directly into its cheese milk because he was called in to solve a clotting problem at Kasson. In order to facilitate Kasson's use of the product in this way, Silverman suggested the technical assistance of a pump. Based on such use of the product, Silverman testified that: (1) he knew that Kasson had to be using Isokappacase in a way other than as a starter media; and (2) he told Donald Vande Yacht, president of Kasson, that its use of Isokappacase in this manner would necessarily result in an end product not conforming to federal standards for real cheese. He said that he subsequently inferred that Kasson had to be mislabeling its end product as real cheese, for had it not, he believed that Kasson would have suffered huge losses before two and one-half years had passed. He testified that he told Podell of his conclusions about Kasson's improper conduct.

Other testimony confirmed Blossom's knowledgeable dealings in Kasson's improper conduct. Bruce Keller, a consultant for Kasson, testified that all of Podell's figures regarding Kasson's volume use of the product were figures projecting yield and cost analysis only. Vande Yacht said he was told by Podell and Silverman that because Isokappacase was a casein product, the end product would not yield real cheese; nonetheless, Vande Yacht testified that, even though he did not directly tell

with these figures, as was Podell, to conclude that Isokappacase was being used as a yield enhancer.

Podell or Silverman that he was labeling his end product as mozzarella and provolone, he continued to order volume shipments and label his imitation cheese as real cheese, primarily because he considered such practice to be within what he called a "grey area" of the law.

Thus, despite Blossom's direct knowledge of Kasson's use of Isokappacase as a yield enhancer and its tacit knowledge of Kasson's misbranding of its end product as real cheese, it still continued to ship volume orders of Isokappacase to Kasson. Both Podell and Silverman knew or should have known that Kasson's volume use of Isokappacase as a yield enhancer meant that it was also improperly mislabeling its end product because they knew that Kasson could not possibly have survived economically if its end product had been sold as an imitation cheese at its concomitantly lower price.

Based on this evidence, the trial court had sufficient evidence on which to base the factual part of its finding that Blossom, aware of Kasson's use of Isokappacase and subsequent mislabeling of its end product, nonetheless continued to sell Isokappacase to Kasson in large quantities, thereby facilitating Kasson's improper conduct.

## UNENFORCEABILITY OF THE CONTRACT

As contract interpretation is a question of law, *Demerath v. Nestle Co.*, 121 Wis.2d 194, 197, 358 N.W.2d 541, 543 (Ct. App. 1984), we construe the contract at issue *ab initio. See Zweck v. D P Way Corp.*, 70 Wis.2d 426, 435–36, 234 N.W.2d 921, 926 (1975).

A decision as to the enforceability of a contract can be reached after a careful balancing, in light of all the

circumstances, of the interest in the enforcement of the particular promise against the policy against enforcement of such terms. Restatement (Second) of Contracts § 178 (1981). In weighing a public policy against enforcement of a term, account is taken of: (1) the strength of that policy as manifested by legislation or judicial decisions; (2) the likelihood that a refusal to enforce the term will further that policy; (3) the seriousness of any misconduct involved and the extent to which it was deliberate; and (4) the directness of the connection between that misconduct and the term. *Id.*

A promise may be unenforceable if it involves conduct offensive to public policy, even though the promise does not actually induce the conduct. *Id.* at comments b, c and d. If the conduct to be engaged in by the promisor is deemed improper conduct because it is against public policy, the promisee's doing of specific acts to facilitate the improper use is a bar to recovery. *Id.* at § 182 comment b.

State legislation which adopted federal standards of identity enforces the public policy of accurately distinguishing imitation or analog cheese from real cheese and labeling it accordingly. Sec. 97.09, Stats. Even though Vande Yacht of Kasson testified that neither Podell nor Silverman was directly told about the mislabeling, sufficient evidence reveals that Podell tacitly knew of Kasson's subsequent misbranding of its end product because of the economics of the situation. Furthermore, despite being aware of Kasson's improper conduct, Blossom chose to overlook it and continued to supply volume shipments to Kasson, thereby engaging in a course of dealing which facilitated Kasson in its improper conduct. This course of dealing benefited both Blossom and

Kasson. Because mislabeling cheese involves conduct offensive to public policy, the trial court correctly concluded that the transaction which anticipated such improper conduct is unenforceable.[8]

*By the Court.*—Judgment affirmed.

[8] Our determination regarding the unenforceability of the contract effectively moots Kasson's cross-appeal.